The Full Commission reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Chapman, the records contained in the Commissions file in this matter and the briefs and oral arguments before the Full Commission. The Full Commission also viewed the disfigurement to plaintiff. The appealing parties have shown good ground to reconsider the evidence in this matter. Having reconsidered the evidence, the Full Commission modifies and affirms the Deputy Commissioners award of benefits and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers Compensation Act.
2. An employer-employee relationship existed between the plaintiff and Raytheon Aerospace Company at all relevant times.
3. Liberty Mutual Insurance Company provides insurance coverage for the employer with respect to this claim.
4. Plaintiffs average weekly wage was $650.00, which yields a weekly compensation rate of $433.33.
In addition, the parties stipulated into evidence the following:
1. An indexed packet of medical records.
2. Ninety-eight pages of material safety data sheets.
3. Three pages of personnel records regarding termination.
 ***********
Based upon all of the competent evidence of record and the reasonable inferences arising therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff, 49 years old at the time of the hearing before the Deputy Commissioner, began working for defendant employer on September 9, 1995 at the central mixing room that was located on base at the Marine Air Station in Cherry Point. Defendant-employer manufactured sealants and adhesives that were used to repair aircraft. Plaintiffs job involved mixing the uncured epoxy base or resin with a catalyst and freezing the mixture before it could harden. She wore a white lab coat, latex gloves and, if required by a material safety data sheet, a filter mask.
2. The chemicals were placed into a bucket and stirred with a pneumatic mixer. Plaintiff would then pour the mixture into tubes, which she labeled and capped. The tubes were lowered into liquid nitrogen for a specified time. She would then take them out, place them into a box and put the box into a freezer. The tubes remained in the freezer until she was notified that the mixture needed to be placed into syringes. At that time, she would remove the appropriate tubes, thaw them in water and then use a device similar to a caulking gun to push the epoxy into syringes. The syringes were then frozen in liquid nitrogen and stored in the freezer.
3. At some point plaintiff was moved to the third shift. On that shift, she did not have to mix the chemicals but would thaw the tubes that had been previously frozen and fill syringes with the uncured epoxy or sealants. She then froze the syringes.
4. On or about February 2, 1996, plaintiff woke up with red patches on her face. She thought that a spider had bitten her but when she saw Dr. Gloria Graham, a dermatologist, that day, Dr. Graham advised her that her condition appeared to be contact dermatitis. Plaintiff explained that she worked with epoxy resins and that she was not aware of any exposure to poison ivy or other plant material. Dr. Graham prescribed medication that helped to clear the dermatitis and offered to test plaintiff for allergy to epoxy glue if she would bring in a sample, but plaintiff did not follow up on the offer. During the next eighteen months, plaintiff had recurrent episodes with similar rashes on her hands, arms, neck and face that she would treat herself.
5. In November 1997 plaintiff had a significant flare-up of her dermatitis and she showed her supervisor the problem. She was then moved to a different position in the "hazmat (hazardous materials) department. Her new job involved issuing chemical kits, which were sealed, performing periodic inventories of the paint lockers and cleaning any paint spills in the lockers. Consequently, she was not normally exposed to uncured epoxy. However, there were occasions when opened chemical kits were returned to her and one of the items in the kit would be epoxy components.
6. On December 3, 1997 plaintiff returned to Dr. Graham with the symptoms from her latest flare-up. Dr. Graham ran a patch allergy test on her thinking that she probably was reacting to the latex gloves she had to wear at work. However, plaintiff did not react to any of the rubber-related patches. Rather, she reacted strongly to the uncured epoxy resin patch. Dr. Graham therefore concluded, and the Full Commission finds as fact, that plaintiff had developed an allergy to uncured epoxy components as a result of her exposure at work. Although she did not actually touch the uncured epoxy, there were enough vapors from the substance as she was manipulating it to trigger a reaction from the skin. This was the first time plaintiff was informed by a physician of the probable relationship between her dermatitis and her exposure to uncured epoxy resins and hardeners at work. She was informed on December 5, 1997, when the results of the tests were explained to her.
7. Dr. Graham wrote a note advising plaintiff and Raytheon Company (Raytheon) that plaintiff should avoid exposure to uncured epoxies. She also prescribed medication for plaintiff to help suppress the latest flare-up of dermatitis. It took a month or two before plaintiffs skin cleared. She did not seek further medical treatment until April 1998 when she experienced recurrent symptoms with a rash on her wrist, forearms and face after having to clean up a paint spill at work. In addition, her right eye was swollen shut that day. With this flare-up, she sought treatment at Beach Care and at the Naval Hospital on base. She was treated with a short course of prednisone.
8. In September 1998 plaintiff was laid off due to a reduction in work force at Raytheon. She thereafter had no known exposure to uncured epoxy or to uncured epoxy resins and hardeners. On February 11, 1999 she saw Dr. Grahams husband, Dr. James Graham, for areas on her arms where she had lost pigment. He then wrote Raytheon and indicated that the areas of hypopigmentation were the result of her initial exposure to epoxy in 1997. He also advised that she should avoid epoxy compounds.
9. Later that month, plaintiff again returned to Dr. James Graham with a flare-up of dermatitis that she thought might be a reaction to her husbands clothing. Her husband was a contractor and was exposed to a number of substances in the construction trade including, potentially, uncured epoxy. She was treated with medication and her symptoms improved. After that time, she continued to have episodes of dermatitis that appeared to be trigged by household cleaning products. Her face had red areas and what appeared to be blemishes at the hearing before the Deputy Commissioner and before the Full Commission and she indicated that she could no longer tolerate sun exposure or makeup.
10. On June 30, 2000, which was after the hearing before the Deputy Commissioner, Dr. Gloria Graham examined plaintiff and noted that she had erythematous dermatitis of the face and arms with itching along with some permanent pigment loss on her arms. Plaintiff advised Dr. Graham that she had had a flare-up at the time of the hearing before the Deputy Commissioner due to using an oven cleaner the day before and that it usually took about a week for her flare-ups to subside. Dr. Graham prescribed medication, gave her advice regarding creams and lotions to use and instructed her to avoid sun exposure.
11. As of February 2, 1996 plaintiff developed contact dermatitis due to exposure to uncured epoxy and to epoxy components in her employment. Her exposure to these substances at work was a significant contributing factor in the development of her dermatitis and, indeed, caused it.
12. Plaintiff had washed her husbands clothing for 18 years, and before her employment with Raytheon had never experienced any sensitivity to his clothing or any fumes from the clothing. Before her employment with Raytheon, plaintiff had never suffered any allergic reaction such as the one described in her testimony and that of Dr. Gloria Graham.
13. Plaintiff was placed at an increased risk of developing contact dermatitis as a result of her workplace exposure to uncured epoxy components as compared to the general public not so employed. Contact dermatitis from exposure to uncured epoxy resins is an acquired allergic condition that comes from exposure. The risk of developing an allergy from exposure to uncured epoxy resins is recognized to the extent that standardized allergen patch testing relied upon by dermatologists has included a patch for such resins. Dr. Graham indicated that in her thirty-five years of medical practice she had not seen many persons who had been exposed to uncured epoxy. Cured epoxy, which is much more commonly found, is not likely to cause an allergic reaction. Allergic contact dermatitis is an acquired condition. It is acquired from exposure to an irritant. It is not something a person is born with. It is not necessary for a person to have direct skin contact with uncured epoxy resin in order to develop an allergic contact dermatitis. Epoxies give off enough vapor when they are not in a cured state to give sufficient exposure to develop dermatitis. Only resins and hardener, the two components of uncured epoxy are allergenic. Cured hardened plastic is not a problem.
14. Since plaintiff was constantly exposed to uncured epoxy and at times exposed to epoxy resins and hardeners in her employment with Raytheon, her exposure exceeded the norm. Consequently, she is found to have been at an increased risk of developing contact dermatitis as a result of her exposure to epoxies at work as compared to the general public not so employed. She therefore sustained an occupational disease which was due to causes and conditions characteristic of and peculiar to her employment with Raytheon and which was not an ordinary disease of life to which the general public was equally exposed.
15. It was Dr. Gloria Grahams opinion, and the Full Commission finds as a fact, that exposure to the epoxy resins in the workplace caused plaintiffs allergic contact dermatitis. Dr. Graham testified that in all of her 35+ years of practice, "I have rarely seen anybody with a positive test like this to epoxies. I mean this is a really very positive test. We tested her with 20 some chemicals, I think, and that was the only thing positive. So I think it really, you know, you'd be pushing the fact very hard to say what I saw her with originally was not caused by something in her work area that we would call epoxy resin. Uncured epoxy resins are not present in the normal home and normal workplace. Most of the things there are cured resins.
16. Plaintiffs allergy was to uncured epoxy resins. A person develops allergic contact dermatitis after being exposed to a given chemical at least once. "Once an allergy develops, lymphocytes in the body are changed and they usually respond in a similar fashion whenever you would come in contact with that. For instance, people with poison ivy, that's an allergic contact dermatitis, will flare almost every time they get any significant exposure, testified Dr. Gloria Graham, and the Full Commission finds her testimony to be credible.
17. The only time plaintiff missed from work due to her dermatitis was in April 1998 after she cleaned up the spill. She only missed three days of work at that time.
18. There is no cure for allergic contact dermatitis. Once a person has been exposed to the irritant and develops allergic contact dermatitis they can have flare ups in the future based upon contact with similar substances or other irritants. For example, plaintiff now suffers flare-ups after exposure to household cleaners. She did not have that problem prior to developing allergic contact dermatitis as a result of her exposure to uncured epoxy resins in her workplace at Raytheon. Plaintiffs skin, because of the contact dermatitis caused by her exposure at work, is more sensitive to chemicals like those found in household cleaners. Defendants are responsible for treatment of flare-ups from other irritants inasmuch as such flare-ups are a natural consequence of the original occupational disease. The Full Commission finds that this constitutes a permanent injury to an important external organ, her skin, within the meaning of N.C. Gen. Stat. 97-31(24), and that reasonable compensation for such injury, considering that she can no longer tolerate sun exposure or makeup and can expect periodic outbreaks of blisters, redness and swelling in the future from contact with household cleaners and her husbands work clothes, is found to be $10,000.00.
19. Plaintiffs claim was filed within two years of the first disability associated with her occupation disease as well as within two years of her first medical notice that the condition was probably work related.
20. The loss of pigmentation on plaintiffs skin is not so disfiguring as to interfere with her ability to get a job. Therefore, she is not entitled to compensation for disfigurement pursuant to N.C. Gen. Stat.97-31(22) at this time.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. In that this claim was filed within two years of plaintiffs first disability from her contact dermatologist and within two years of the date Dr. Graham informed her that the condition was probably work related, the claim is not time barred and the Industrial Commission has jurisdiction over the matter. N.C. Gen. Stat. 97-58; Dowdy v. FieldcrestMills, 308 N.C. 701 (1983). "An employee must be informed clearly, simply and directly that he has an occupational disease and that the illness is work-related to trigger the running of the two-year period set forth in G.S. 97-58. Lawson vs. Cone Mills, 68 N.C. App. 402, 410 (1984). The evidence in this case establishes that plaintiff was not clearly, simply and directly informed that she had developed allergic contact dermatitis to epoxy resins and that the illness was work related until December 5, 1997.
2. Plaintiff has proven that she developed an occupational disease which was due to causes and conditions characteristic of and peculiar to her employment and which was not an ordinary disease of life to which the general public was equally exposed. N.C. Gen. Stat. 97-53(13); Booker v.Duke Medical Center, 297 N.C. 458 (1979). To be compensable a disease must be characteristic of and peculiar to a particular trade, occupation or employment. A disease is characteristic of employment when there's a recognizable link between the nature of the job and an increased risk of contracting the disease in question. The term, "peculiar to occupation, is not used in the sense that the disease must be one which originates exclusively from a particular type of employment in which the employee is engaged, but in the sense that the conditions of that employment result in a hazard which distinguishes it from the general run of occupations.Booker, supra. "In the case of occupational diseases proof of a causal connection between the disease and the employees occupation must of necessity be based on circumstantial evidence. Among the circumstances which may be considered are the following: (1) the extent of exposure to the disease or the disease-causing agents during employment, (2) the extent of exposure outside employment, and (3) absence of the disease prior to the work-related exposure as shown by the employees medical history. Id, at page 476.
3. In that plaintiff has been disabled for fewer than seven days as a result of her occupational disease, she is not entitled to compensation for temporary total disability at this time. N.C. Gen. Stat. 97-28.
4. Plaintiff is entitled to have defendants provide all medical compensation arising from this occupational disease, past, present and future. Defendants are also liable for past, present and future medical treatment arising from dermatitis due to other exposures, including those associated with household cleaning products, since her original compensable allergy sensitized her for developing allergic reactions to household cleaners and her husbands work clothes. N.C. Gen. Stat. 97-2(19),97-25, 97-59.
5. The insurance carrier appealed this case, as did plaintiff. Since the insurance carrier did appeal and the Full Commission by this Opinion and Award orders the insurer to make, or to continue payments of benefits, including compensation for medical expenses, to the injured employee, the Commission may further order that the cost to the injured employee of such hearing or proceedings including therein reasonable attorneys fee to be determined by the Commission shall be paid by the insurer as a part of the bill of costs. N.C. Gen. Stat. 97-88. Reasonable attorney fees for plaintiffs counsel in defending defendants appeal is found to be $1,000.00.
6. Plaintiff is not entitled to compensation for disfigurement pursuant to N.C. Gen. Stat. 97-31(22) at this time.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendants shall pay all medical expenses incurred by plaintiff as a result of her occupational disease, past, present and future. Defendants shall also pay for past, present and future medical treatment arising from dermatitis due to other exposures, including those associated with household cleaning products, since plaintiffs original compensable allergy sensitized her for developing allergic reactions to household cleaners and her husbands work clothes.
2. Subject to the 25% attorney fees hereafter awarded, defendants shall pay to plaintiff compensation pursuant to N.C. Gen. Stat. 97-31(24) in the amount of $10,000.00. Plaintiffs portion, $7,500.00 shall be paid forthwith in a lump sum. Attorneys fees in the amount of 25% of the $10,000.00 compensation awarded are found to be reasonable for plaintiffs counsel and defendants shall pay such $2,500.00 forthwith in a lump sum to plaintiffs counsel.
3. Defendants shall pay an additional $1,000.00 forthwith to plaintiffs counsel as attorney fees pursuant to N.C. Gen. Stat. 97-88.
4. Defendants shall pay the costs.
This 15th day of May, 2001.
 S/_____________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER