RUFUS CAPPS, IV, Plaintiff v. SOUTHEASTERN CABLE and COMPANION
PROPERTY & CASUALTY, Defendants

No. COA10-505

(Filed 2 August 2011)

**Workers' Compensation—independent contractor—employer-employee relationship**

The Industrial Commission erred by dismissing plaintiff's workers' compensation benefits claim on the grounds that plaintiff worked for defendant company as a subcontractor instead of an employee. Defendant exerted the degree of control of plaintiff that was characteristic of an employer's control over an employee.

Appeal by plaintiff from Opinion and Award entered 8 March 2010 by the North Carolina Industrial Commission. Heard in the Court of Appeals 1 November 2010.

*West & Smith, LLP, by Stanley W. West, and Jay S. Gervasi, P.A., by Jay A. Gervasi, Jr., for Plaintiff-Appellant.*

*McAngus, Goudelock & Courie, P.L.L.C., by Laura Carter and Layla T. Santa Rosa, for Defendant-Appellees.*

ERVIN, Judge.

Plaintiff Rufus Capps, IV, appeals from an order entered by the Industrial Commission dismissing his claim for workers' compensation benefits on the grounds that Plaintiff worked for Defendant Southeastern Cable as a subcontractor rather than an employee, thereby depriving the Commission of jurisdiction over Plaintiff's claim. On appeal, Plaintiff argues that the evidence established that he was Southeastern's employee and that his claim for workers' compensation benefits was, in fact, subject to the Commission's jurisdiction. After carefully considering Plaintiff's arguments in light of the record and the applicable law, we conclude that Plaintiff's argument has merit.

## I. Factual Background

### A. Substantive Facts

Time Warner, Inc., provides cable television and internet service. In 2007, Time Warner contracted with Southeastern to install cable TV and internet service for customers. Robert Hair, who owns

CAPPS v. SE. CABLE

[214 N.C. App. 225 (2011)]

Southeastern, entered into agreements with eight to ten people, including Plaintiff, to perform the actual installation work. Southeastern treated the installers as independent subcontractors and required them to obtain workers' compensation insurance prior to starting work. Plaintiff obtained a "ghost" insurance policy that excluded him from its coverage.

After working for Southeastern for several weeks, Plaintiff fell while performing installation work, resulting in injuries to his left foot which the parties agree would be compensable in the event that Plaintiff were a Southeastern employee. Southeastern denied Plaintiff's claim on the grounds that Plaintiff was not an employee. Plaintiff, on the other hand, contends that he was a Southeastern employee.

### B. Procedural History

On 14 November 2007, Plaintiff filed an amended Form 18, in which he sought workers' compensation benefits, and an amended Form 33, in which he requested that his claim be assigned for hearing. In response, Defendants asserted that Plaintiff was a subcontractor and that he was not entitled to receive workers' compensation benefits for that reason. On 17 November 2008, Deputy Commissioner Philip A. Baddour, III, conducted a hearing concerning Plaintiff's claim. On 29 July 2009, Deputy Commissioner Baddour issued an Opinion and Award concluding that Plaintiff was a Southeastern employee and awarding Plaintiff medical and disability benefits. Both Plaintiff and Defendants appealed Deputy Commissioner Baddour's order to the Commission. On 8 March 2010, the Commission, by means of an Opinion and Award issued by Commissioner Dianne C. Sellers with the concurrence of Commission Chair Pamela T. Young and Commissioner Staci Meyer, reversed Deputy Commissioner Baddour's order on the grounds that, since Plaintiff was an independent contractor, the Commission lacked jurisdiction over Plaintiff's claim. Plaintiff noted an appeal to this Court from the Commission's order.

### II. Legal Analysis

### A. Standard of Review

"To maintain a proceeding for workers' compensation, the claimant must have been an employee of the party from whom compensation is claimed. Thus, the existence of an employer-employee relationship at the time of the injury constitutes a jurisdictional fact. . . . 'The finding of a jurisdictional fact by the Industrial Commission is not conclusive upon appeal even though there be evidence in the

record to support such finding. The reviewing court has the right, and the duty, to make its own independent findings of such jurisdictional facts from its consideration of all the evidence in the record.' " *McCown v. Hines*, 353 N.C. 683, 686, 549 S.E.2d 175, 177 (2001) (citing *Youngblood v. North State Ford Truck Sales*, 321 N.C. 380, 383, 364 S.E.2d 433, 437 (1988), and quoting *Lucas v. Stores*, 289 N.C. 212, 218, 221 S.E.2d 257, 261 (1976)). As a result, "when a party challenges the Commission's jurisdiction to hear a claim, the findings relating to jurisdiction are not conclusive and the reviewing court may consider all of the evidence in the record and make its own determination on jurisdiction." *Tilly v. High Point Sprinkler*, 143 N.C. App. 142, 146, 546 S.E.2d 404, 406 (2001) (citing *Craver v. Dixie Furniture Co.*, 115 N.C. App. 570, 577, 447 S.E.2d 789, 794 (1994)), *disc. review denied*, 353 N.C. 734, 552 S.E.2d 636 (2001). This Court makes determinations concerning jurisdictional facts based on the greater weight of the evidence. *Youngblood*, 321 N.C. at 384, 364 S.E.2d at 437. As is generally the case in connection with jurisdictional issues, "[t]he plaintiff bears the burden of proving each element of compensability . . . by 'a preponderance of the evidence.' " *Everett v. Well Care & Nursing Servs.*, 180 N.C. App. 314, 318, 636 S.E.2d 824, 827 (2006) (quoting *Holley v. ACTS, Inc.*, 357 N.C. 228, 231-32, 234, 581 S.E.2d 750, 752 (2003)). Thus, "the claimant bears the burden of proving the existence of an employer-employee relationship at the time of the accident." *McCown*, 353 N.C. at 686, 549 S.E.2d at 177 (citing *Lucas*, 289 N.C. at 218, 221 S.E.2d at 261).

Although Defendants acknowledge that this Court must make its own findings of jurisdictional facts, they argue that we "cannot reweigh the evidence regarding the credibility of the witnesses and must defer to the . . . [C]ommission's findings regarding credibility." However, as we have previously noted, "[i]n performing our task to review the record *de novo* and make jurisdictional findings independent of those made by the Commission, we are necessarily charged with the duty to assess the credibility of the witnesses and the weight to be given to their testimony, using the same tests as would be employed by any fact-finder in a judicial or quasi-judicial proceeding." *Morales-Rodriguez v. Carolina Quality*, —— N.C. App. ——, ——, 698 S.E.2d 91, 94 (2010). We are conscious of the fact that we have not had an opportunity to observe the demeanor of the witnesses. However, in that respect, we are in the same position as the Commission, which based its findings in this case on information contained in the written record rather than upon testimony provided by live witnesses.

Whether the full Commission conducts a hearing or reviews a cold record, [N.C. Gen. Stat.] § 97-85 places the ultimate fact-finding function with the Commission—not the hearing officer. It is the Commission that ultimately determines credibility, whether from a cold record or from live testimony. Consequently, in reversing the deputy commissioner's credibility findings, the full Commission is not required to demonstrate, as *Sanders [v. Broyhill Furniture Industries*, 124 N.C. App. 637, 641, 478 S.E.2d 223, 226 (1996),] states, "that sufficient consideration was paid to the fact that credibility may be best judged by a first-hand observer of the witness when that observation was the only one." To the extent that *Sanders* is inconsistent with this opinion, it is overruled.

*Adams v. AVX Corp.*, 349 N.C. 676, 681, 509 S.E.2d 411, 413-14 (1998) (quoting *Sanders*, 124 N.C. App. at 641, 478 S.E.2d at 226, *disc. rev. denied*, 346 N.C. 180, 486 S.E.2d 208 (1997), *overruled in part as stated*). In our credibility determination, we "consider the [tests enunciated in the] North Carolina pattern jury instructions, which" state that a credibility determination should rest upon the use of " 'the same tests of truthfulness which you apply in your everyday lives. . . .' " *In re Hayes*, 356 N.C. 389, 404-05, 584 S.E.2d 260, 270 (2002) (quoting N.C.P.I.-Civil 101.15 (1994). Finally, at least in this instance, we are not called upon to make many judgments as to the truthfulness of any witness. Although the Commission found that the testimony of one of Southeastern's witnesses was more credible than that of Plaintiff, we are not convinced that there is any significant credibility issue involved in this case. Instead, the proper resolution of the jurisdictional controversy at issue here hinges primarily upon the proper application of the law to essentially undisputed evidentiary facts.

Our determination of whether Plaintiff has demonstrated the existence of an employee-employer relationship begins with N.C. Gen. Stat. § 97-2(2), which provides that:

The term "employee" means every person engaged in an employment under any appointment or contract of hire or apprenticeship, express or implied, oral or written . . . whether lawfully or unlawfully employed[.]

As the Supreme Court has stated, "[t]his definition adds nothing to the common law meaning of the term 'employee.' " *Hicks v. Guilford County*, 267 N.C. 364, 367, 148 S.E.2d 240, 243 (1966) (citing *Hayes v.*

*Elon College,* 224 N.C. 11, 19, 29 S.E.2d 137, 142 (1944)). The Supreme Court stated in *Hayes* that:

[T]he retention by the employer of the right to control and direct the manner in which the details of the work are to be executed and what the laborers shall do as the work progresses is decisive, and when this appears it is universally held that the relationship of master and servant or employer and employee is created. Conversely, when one who, exercising an independent employment, contracts to do a piece of work according to his own judgment and methods, and without being subject to his employer except as to the result of the work, and who has the right to employ and direct the action of the workmen, independently of such employer and freed from any superior authority in him to say how the specified work shall be done or what laborers shall do as it progresses, is clearly an independent contractor. The vital test is to be found in the fact that the employer has or has not retained the right of control or superintendence over the contractor or employee as to details.

. . . .

What, then, are the elements which ordinarily earmark a contract as one creating the relationship of employer and independent contractor? The cited cases and the authorities generally give weight and emphasis, amongst others, to the following: The person employed

(a) is engaged in an independent business, calling, or occupation;

(b) is to have the independent use of his special skill, knowledge, or training in the execution of the work;

(c) is doing a specified piece of work at a fixed price or for a lump sum or upon a quantitative basis;

(d) is not subject to discharge because he adopts one method of doing the work rather than another;

(e) is not in the regular employ of the other contracting party;

(f) is free to use such assistants as he may think proper;

(g) has full control over such assistants; and

(h) selects his own time.

*Hayes,* 224 N.C. at 15-16, 29 S.E.2d at 139-40. Put another way:

The distinction between an independent contractor and a servant, employee, or agent has been clearly drawn in numerous recent cases. Tersely stated, the test which will determine the relationship between parties where work is being done by one which will advantage another is: Who is boss of the job?

*Pressley v. Turner*, 249 N.C. 102, 104, 105 S.E.2d 289, 292 (1958) (citing *Pearson v. Flooring Co.*, 247 N.C. 434, 442, 101 S.E.2d 301, 306 (1958), and *Hayes*, 224 N.C. at 15-16, 29 S.E.2d at 140 (other citations omitted). "No particular one of these factors is controlling in itself, and all the factors are not required. Rather, each factor must be considered along with all other circumstances to determine whether the claimant possessed the degree of independence necessary for classification as an independent contractor." *McCown*, 353 N.C. at 687, 549 S.E.2d at 178. Although the factors cited in *Hayes* necessarily play an important role in the proper resolution of this issue, nothing in that decision suggests that the factors delineated by the Supreme Court are the only relevant factors or that other facts should not be considered in the jurisdictional analysis. Against that background, we next address the record evidence relating to the jurisdictional issues, beginning with an analysis of the evidence relating to the *Hayes* factors.

B. Analysis of Evidence Regarding Plaintiff's Employment Status

1. Factors Cited in *Hayes*

a. Independent Business

Evidence that the claimant operated an independent business tends to support a conclusion that he or she was an independent contractor. *See, e.g., Doud v. K & G Janitorial Service*, 69 N.C. App. 205, 212, 316 S.E.2d 664, 669 (noting that claimant "was the sole proprietor of K & G Janitorial Services, an independent business"), *disc. review denied*, 312 N.C. 492, 322 S.E.2d 554 (1984). At the hearing, Plaintiff testified that he did not operate an independent business, an assertion which is not directly contradicted in the record. Although Defendant provided Plaintiff with the tax forms that are appropriate for use by an independent contractor, required Plaintiff to obtain his own workers' compensation insurance, and informed him that he was being hired as a subcontractor rather than an employee, we do not give significant weight to this evidence since all that this evidence tends to show is the manner in which Defendant wished to have the relationship characterized. As the Supreme Court has previously noted, "the parties' own conclusion about their legal relationship is

not binding on the court." *Lemmerman v. Williams Oil Co.*, 318 N.C. 577, 584, 350 S.E.2d 83, 88 (1986) (citing *Lloyd v. Jenkins Context Co.*, 46 N.C. App. 817, 266 S.E. 2d 35 (1980), and *Rucker v. Hospital*, 285 N.C. 519, 206 S.E. 2d 196 (1974)).

In addition, the undisputed record evidence shows that, during the time that Plaintiff performed installation work for Defendant, he did not work for any other installation company. Although the Commission found that Plaintiff was subject to "no restrictions" with respect to his ability to work for other entities or customers, Defendant Hair testified that:

Q. Okay. Do you have any restrictions on who the subcontractors can work for?

A. No.

Q. Okay. So they can work for another subcontractor or general subcontractor?

A. There's a no-compete clause which you—refers to me. I can't compete with any other system. You know, I don't want to cause Time Warner any conflict. I have guys that can go out and lay bricks if they want to if they're done with their route. That's entirely up to them.

Q. Okay. And they can go out and perform other cabling jobs if they want to, correct?

A. Other what?

Q. Other cabling jobs.

A. Not for—not for a competition clause against Time Warner. They could—they could install satellite outlets for someone if they wanted to on their time.

Although Mr. Hair testified that, "as a subcontractor," Plaintiff could work for whomever he chose, Greg Adair, Southeastern's operations manager, testified that:

Q. Is it possible to work for another company other than Southeastern Cable for these installers?

A. These guys, a lot of them do side things, yeah. . . . There's guys who lay carpet, lay brick, do bundle siding and everything on the weekends they have off or nights, whatever.

Q. Okay. What about additional cabling jobs, are they allowed—

CAPPS v. SE. CABLE

[214 N.C. App. 225 (2011)]

A. If they do it if—as long as it's not a Time Warner work order[.]

As a result, the evidence suggests that Plaintiff did not operate his own cable installation business or have unlimited freedom to perform individual installation jobs for anyone who wished to hire him for that purpose.

### b. Special Skill or Knowledge

Next, we consider the extent to which, in performing jobs for Southeastern, Plaintiff had "the independent use of his special skill, knowledge, or training in the execution of the work." Although the Commission did not make any findings relating to this fact, our analysis of the record suggests that (1) the type of cable installations performed by Plaintiff required some degree of "special skill, knowledge, or training" and that, (2) assuming Plaintiff was required to possess a special skill, he did not have the unfettered right to make "independent use" of that skill, knowledge, and training.

The only testimony pertaining to this factor was Plaintiff's testimony on cross-examination that:

Q. . . . [Y]ou indicate you've got fifteen years as data-line and cable-line experience, is that correct?

A. Yes, ma'am.

Q. Okay. Now, data-line and cable-line experience is a special skill, correct?

A. Yes, ma'am, I guess so.

Q. And it requires some type of specific knowledge, correct?

A. Yes, ma'am.

The record does not, however, contain any evidence concerning the degree of technical knowledge involved in cable installation work, how difficult it is to obtain the required skills, or how long the required educational process usually takes. Although the undisputed evidence in the record indicates that Southeastern trained Plaintiff for several weeks before he was allowed to perform cable installations, the record is completely devoid of any evidence concerning the extent, if any, to which the training Plaintiff received from Southeastern was sufficient to qualify an individual to perform cable installation work. We conclude that this brief cross-examination, unaccompanied by specific evidence, is insufficient to enable us to

assess the extent to which Plaintiff utilized special skill, knowledge and training in performing cable installation work.[1] In the absence of such evidence, we cannot assume that Plaintiff's job responsibilities can be fairly characterized as involving highly skilled work. *See, e.g., Burgess v. NaCom Cable Co.*, 923 S.W.2d 450, 454 (Mo. App. E.D. 1996) (stating that "[t]he skill level of the [cable] installer is not particularly high, generally, especially since the techniques can be learned in less than three days and no later than thirty days"). Thus, the only inference that the record will allow us to draw concerning the skill level required of persons in Plaintiff's position was that the necessary cable installation work required some degree of special skill, knowledge, or training.

Assuming, for purposes of argument, that cable installation work involves the use of special skill, knowledge, or training, we also must consider whether Plaintiff engaged in the "independent use" of his knowledge and skills while performing cable installation work for Southeastern. The greater weight of the evidence fails to establish that Plaintiff had the freedom to exercise such independent judgment. Although Plaintiff had been employed in the cable installation field for fifteen years, Defendant required him to undergo a three week training course before he could be assigned to work on his own. Plaintiff testified that he was trained according to Southeastern's specifications and that one of Southeastern's "supervisors" "would show [him] how Time Warner wanted . . . each individual thing done." According to Mr. Adair, the training that Plaintiff received was necessary because Time Warner demanded that Southeastern's work be performed "exactly the way the manual

---

1. Compare, for example, *Santelices v. Cable Wiring*, 147 F. Supp. 2d 1313, 1320 (S.D. Fla. 2001), in which the record reflected that cable installation required "the ability to competently connect cables from a main feed outside into a home (to the television set and VCR), run cables in between walls, bury cable lines underground, and install converter boxes" and in which the claimant "testified that he also learned the more technical side of cable installation, including construction work with cable, underground fiber, splicing taps, and making new systems," that "he was required to demonstrate his special skill, his ability to satisfy TCI technical specifications in performing digital/cable work, by participating in a day-long digital cable installation training class at TCI under TCI's supervision," and that he "was required to pass a written exam and physically demonstrate his proficiency at digital cable installations," with *Parrilla v. Allcom Constr. & Installation Servs., LLC*, 2009 U.S. Dist. LEXIS 130421 (M.D. FL 2009), *motion denied* 688 F. Supp. 2d 1347 (2010) (stating that the "[p]laintiff's work did not require the application of particularly special, or difficult to acquire, skills" and that, "[a]lthough Plaintiff's work involved proper cable wiring, connecting and configuring Internet cable modems, the use of a cable meter, and answering customer's questions, . . . those skills could be acquired in as little as two weeks of on-the-job training").

says." In addition, Mr. Hair testified that, before a new installer was assigned work, an experienced installer would "take them out in the field and train them approximately three to five weeks, whatever it takes," and that the supervisor would "let [him] know if that individual is up and running." After receiving training for three weeks, Plaintiff worked independently for two weeks prior to the date on which he was injured. Although a subcontractor clearly must receive some level of direction prior to undertaking a particular job, the fact that Plaintiff was required to undergo three to five weeks of training before starting work seems more consistent with the degree of control to which an employee is subject than with the free exercise of independent judgment normally characteristic of work performed by an independent contractor.

In addition, the Commission found that Plaintiff provided his own tools. Under some circumstances, this fact might tend to show that the claimant exercised independent judgment, if he or she were at liberty to utilize the tools that he or she considered appropriate in order to perform the necessary work. However, the undisputed evidence shows that Southeastern required Plaintiff to use a particular set of tools, undercutting any inference that Plaintiff was free to exercise independent judgment in connection with the performance of his work. Plaintiff's testimony to this effect is bolstered by a document titled Southeastern Cable Tech Tool Requirements, which lists the tools that installers were required to use and states that, "if anything else is needed, contact your immediate supervisor only!" (emphasis in original) Mr. Hair agreed that cable installation technicians were required to use certain tools and testified that, if a technician lacked the required tools, "[he would] purchase them and take it from their check." For example, Mr. Hair provided Plaintiff with a meter costing $379.00, for which Plaintiff reimbursed Mr. Hair "[w]eekly, out of his check."

Finally, the undisputed evidence shows that, to a considerable extent, the manner in which installation jobs were to be performed was prescribed by Southeastern's contract with Time Warner. The record contains no evidence tending to show whether there was any scope for the exercise of discretion or independent judgment by cable installation technicians in light of these contractual terms. Thus, taking all of this information into consideration, we conclude that, while the evidence tends to show that Plaintiff's cable installation work involved some degree of special skills, knowledge, or training, the evidence does not support a conclusion that Plaintiff was

allowed to make appreciable "independent use" of such skills "in the execution of the work."

### c. Payment Structure

Next, we consider whether Plaintiff performed "a specified piece of work at a fixed price or for a lump sum or upon a quantitative basis." The undisputed evidence in the present record shows that, instead of negotiating individual installation prices, each cable installation technician received sixty percent of the fee paid to Defendant Southeastern by Time Warner. As a result, the record shows that Plaintiff was paid on a "piece work" basis, earning a set amount for each job he completed.

> " 'Payment on a time basis is a strong indication of the status of employment. Payment on a completed project basis is indicative of independent contractor status. Payment on a piece-work or commission basis is consistent with either status.' "

*Juarez v. CC Servs.*, 434 F. Supp. 2d 755, 761 (2006) (quoting Arthur Larson & Lex K. Larson, *Larson's Workers' Compensation Law* § 61.06 (2005)). Thus, the manner in which Plaintiff was paid sheds little light on the jurisdictional issue that we must resolve in this case.

### d. Whether Plaintiff was Subject to Discharge

Next, we consider whether Plaintiff was "subject to discharge because he adopts one method of doing the work rather than another." Although the Commission found that Defendant Hair testified that he "could not 'fire' the independent contractors as they were not employees of Southeastern Cable," we believe that the undisputed record evidence undercuts this assertion. In his testimony, Plaintiff asserted that he was subject to being fired. Mr. Hair testified that:

Q. Okay. Have you ever fired or discharged a subcontractor?

A. Yes.

Q: How do you fire a subcontractor?

A. I don't route them anymore.

Mr. Hair testified that he would "fire" a cable installation technician for "poor performance, not showing up for work, having someone having to pick up their route constantly, [and] not [being] dependable" and that, if someone "does shoddy workmanship, I just have to

let him go." Mr. Hair's testimony concerning this subject is consistent with the evidence tending to show that Time Warner had detailed specifications for the performance of installations, that Plaintiff had to undergo several weeks of training in order to perform his work consistently with Time Warner's requirements, and that Plaintiff was required to use specific tools in the performance of his work. As a result, we conclude that Southeastern did have what amounted to the right to fire Plaintiff, although the manner in which that right was exercised is not inconsistent with the manner in which the services of an unsatisfactory independent contractor would be terminated, precluding us from giving this factor much weight in the ultimate jurisdictional determination.

### e. Whether Plaintiff was a Regular Employee of Defendant

Another factor listed in *Hayes* is the extent to which the claimant was "in the regular employ" of Defendant. Although this factor might be pertinent in cases in which an employee was hired to do additional work outside the context of his ordinary employment-related responsibilities, it has little relation to the proper resolution of the present inquiry. As a result, we do not find this factor particularly pertinent to the decision we are required to make in this case.

### f. Plaintiff's Authority to Employ Assistants

Next, we consider whether Plaintiff was "free to use such assistants as he may think proper" and, if so, whether he had "full control over such assistants." Plaintiff testified that neither he nor any other individual performing cable installation work for Defendant ever hired any assistants. Although Mr. Hair admitted that none of the cable installation technicians had an assistant, he testified that, at least in theory, they were permitted to do so. However, the record tends to show that the hiring of assistants would not have been an economically sensible approach for Plaintiff to adopt and that any such assistants would have been subject to the same limitations concerning the necessity for training, the use of specified tools, and the need for compliance with Time Warner's standards as were imposed upon other cable installation technicians. As a result, while "Defendant ostensibly gave Plaintiff the option to hire others through his own company," "that option was illusory." *Parrilla*, 2009 U.S. Dist. LEXIS 77585 at 13.[2]

---

2. Although Defendants argue that Southeastern's cable installation technicians effectively utilized assistants when they procured assistance from other technicians on days when they got behind, we do not believe that this informal intra-technician

### g. Southeastern's Control over Plaintiff's Schedule

As we have already noted, the analysis set out in *Hayes* includes consideration of the extent to which a technician was entitled to "select[] his own time" for work. Although the Commission found that Defendant "does not control the independent contractors' hours," we conclude that Southeastern did, in fact, exert significant control over Plaintiff's working hours.

According to the arrangements made between Time Warner and its end-user customers, installation jobs had to be performed within a specific time period, which typically involved a two hour window. As a result, individual cable installation technicians had to complete the work orders that had been assigned to them within this two hour interval. "This constituted a direct exercise of control. Where the worker himself selects the time of performance, contractorship is indicated. However, where the worker must conform to a particular schedule . . . the relationship is normally one of employment." *Youngblood*, 321 N.C. at 385, 364 S.E.2d at 438 (citing *Hayes*, 224 N.C. at 15-16, 29 S.E.2d at 140) (other citations omitted).

Plaintiff testified that, at the time he interviewed for the Southeastern position, he was told that the position involved full time employment, that he would work five days every week, and that he would be expected to work on Saturdays on some occasions. Mr. Hair conceded that Southeastern's technicians worked six days a week which was "part of the job Monday through Saturday." In addition, Plaintiff testified that:

> We would report to the office at 8:00, fill out the paperwork for the prior day's work orders, turn those in, and then [Defendant] would lay out that day's schedule, so you would go up, and he would have a, you know, list of work orders that had your name and tech number on it. You were to take that list.

Consistently with Plaintiff's testimony, Mr. Hair told the Commission that "[t]he work orders are printed, and we'll lay them out on the table, and we'll assign no more than five jobs based on what that individual is capable of doing." Plaintiff testified that he reported to the office every morning; Defendant did not dispute Plaintiff's claim that cable installation technicians were required to come to the office on

---

"job swapping" represents the sort of "assistance" contemplated by the relevant portion of the *Hayes* decision. In addition, the record contains no evidence tending to show that Plaintiff would have had any control over the work performed pursuant to such an informal intra-technician job swap.

a daily basis, although he clarified Plaintiff's claim by stating that "[t]hey can come by in the afternoon and pick up work orders" instead of in the morning. Similarly, Mr. Adair testified that:

Q. [The installers are] required to come in every day and get their—?

A. They're required to come in if they want to make any money. That's correct.

Thus, the undisputed evidence shows that Plaintiff was required to report to Defendant's office on a daily basis to submit required reports and to receive each day's work assignments.[3]

In addition, Plaintiff testified that, upon completing his assigned installations, he "would call [his] supervisor and [the supervisor] would see if there was any other orders[.]" Defendant Hair, on the other hand, testified that, when an installer finished a job, he was required to "call Time Warner and code the job out upon completion;" that he had not personally asked the installers to call Southeastern upon completion of the day's assignments; and that he had "no clue" whether Plaintiff's supervisor had directed him to make such a call. Defendant Hair did, however, testify that he used a computer program to keep track of the progress made by individual cable installation technicians in completing their assigned work:

A. We can look at the AS400 and find out exactly when our techs are finished with certain jobs . . . and can tell when they're leaving to go home.

Q. [W]hat is the AS400?

A. That's just a system . . . on the computer. . . . [W]e can actually look and see if someone's in a bind or . . . if they're doing well that day[.]

As a result, it is clear that Plaintiff was required to report to Defendant Southeastern concerning the day's job activities, with the

---

3. We are not, for obvious reasons, convinced that the exact time of day at which the cable installation technicians came by the Southeastern office is particularly important. The important fact for purposes of our analysis, and which appears to be undisputed, is that Southeastern wanted the cable installation technicians to come by its office on a daily basis for work-related purposes.

exact manner in which such reports were submitted irrelevant to the ultimate issue that we must resolve in this case.[4]

In addition, Plaintiff also presented evidence tending to show that he had to submit a request to his supervisor if he wanted to take a day off and that he was "supposed to submit [this request] two weeks ahead of time." Plaintiff's assertion was corroborated by Exhibit 5, a document titled Southeastern Cable Request for Non-Paid Day(s) Off, a form with blank spaces for "Tech Name," "Date," "Requested Date(s) Off," "Immediate Supervisor," and "Approval," with the technician's supervisor having the option to check either "Yes" or "No" with respect to the request in question. The leave request form stated that it "MUST BE PRESENTED TO YOUR IMME-DIATE SUPERVISOR NO LESS THAN TWO (2) WEEKS PRIOR TO DATE REQUESTED" and that "UNGRANTED ABSENTEEISM WILL RESULT IN DISCIPLINARY ACTION" (use of all caps and emphasis in original). Aside from showing that Southeastern exercised control over Plaintiff's schedule, the document provides compelling evidence that Southeastern regarded the cable installation technicians as working under the authority of "supervisors" who had the power to grant or deny a request for time off, a picture which is dramatically different from the situation faced by a subcontractor who is free to tell the site boss that, for example, he "has to work on another job tomorrow but will be back the day after."

Furthermore, Plaintiff testified that the cable installation techni-cians were divided into two teams for the purpose of establishing "a weekend rotation, so A team would work, say, this Saturday and B team next Saturday[.]" Although Mr. Hair did not dispute the exis-tence of these "teams," he claimed that the cable installation techni-cians had created them on their own and that the "supervisors" oper-ated on an informal, rather than a formal, basis. Mr. Hair also denied that Southeastern controlled the working hours of the cable installa-tion technicians. Instead, he claimed that the cable installation tech-nicians were free to leave work each day as soon as they completed their last assigned task. Although Defendant Hair acknowledged the use of the leave form described in Plaintiff's testimony, he stated that "[w]e just done that because it got out of hand a couple of times. You'd have four or five guys wanting to get off at one time." When asked whether cable installation technicians had to give notice

---

4. Although Defendants emphasize that the cable installation technicians were required to contact Time Warner after completing work on a particular assignment, the record tends to show that, not surprisingly, Southeastern kept up with the progress of each technician's work as well.

before taking vacation time, Mr. Hair replied that, "[i]f we have fifty jobs scheduled on a weekly time frame, we've got to know that we've got . . . ten techs to do the job and five jobs apiece." According to Mr. Hair, the cable installation technicians were essentially providing "notification" that they were going to take a day off, not asking permission to do so.

Although the testimony provided by Plaintiff and Defendant Hair with respect to the leave issue was in conflict, Defendant Southeastern conceded the use of the leave request form. "It is a well-established rule that the intent of a party is to be ascertained by the words he chooses." *Franklin v. Faulkner*, 248 N.C. 656, 659, 104 S.E.2d 841, 843 (1958) (citations omitted). We conclude that, were the cable installation technicians merely providing "notice" that they intended to take time off, there would have been no need for the portion of the form that stated that the leave request or notification form "MUST BE PRESENTED TO YOUR IMMEDIATE SUPERVISOR NO LESS THAN TWO (2) WEEKS PRIOR TO DATE REQUESTED" and that "UNGRANTED ABSENTEEISM WILL RESULT IN DISCIPLINARY ACTION." As a result, given the full-time nature of the work required of cable installation technicians, the requirement that the necessary installation work be performed within a certain window, the fact that that Southeastern monitored the progress made by each technician, the fact that each technician needed to come to Southeastern's office each day, and the necessity for technicians to obtain authorization prior to taking time off, the record evidence tends to show that Plaintiff's schedule was, in large part, subject to Southeastern's control.

## 2. Other Evidence

As we have already discussed, *Hayes* did not suggest that the criteria listed in that decision were intended to be exclusive. We now examine a number of other factors that we believe to be relevant.

## a. Organizational Structure

Plaintiff testified that his supervisor was Chris Carter, who also performed cable installation work for Defendant Southeastern. The record contains the following documents:

1. A document titled "Contact List" identifying Plaintiff as a member of the ten man "Installation Department" and naming Chris Carter and Tim Lewis as "Supervisors" of the Installation Department.

2. A document titled "Contacts," identifying Mr. Hair as Southeastern's owner, Chris Carter and Tim Lewis as "Field Supervisors," and Greg Adair as the "Warehouse Supervisor."

Mr. Hair testified that the "supervisors" named in these documents were technicians who helped ensure that all the jobs were completed in a timely fashion and that, if a supervisor worked on a job assigned to a technician, Mr. Hair might pay them "three or four hundred dollars" of his own money. In addition, Mr. Hair stated that the supervisors "would handle additional responsibilities" and that, when Plaintiff was injured, "[h]e called the supervisor, and the supervisor called me."

> Q. Well, there was a regular hierarchy in your business, [wasn't] there? There was you, and there were supervisors, and there were installers, weren't there?
>
> A. Right.
>
> Q. And the installers . . . answered to the supervisors, didn't they?
>
> A. Right.

As a result, Defendant Hair did not dispute the existence of these "supervisors." Thus, we conclude that this organizational structure, in which Plaintiff had a "supervisor," tends to militate against a determination that Plaintiff was an independent contractor.

### b. Insurance Requirements

The record clearly establishes that Defendant Southeastern required Plaintiff to obtain an insurance policy that included a workers' compensation component before he began work. Plaintiff testified that, when he was hired, he was told "[he] had to have general liability insurance, workers' comp insurance and a vehicle." More particularly, Mr. Hair testified that cable installation technicians were "told explicitly that they've got to have coverage that takes care of themselves." Mr. Hair testified that cable installation technicians were required to have a certain amount of coverage, but denied steering them to any particular insurance agent. Defendant Hair admitted that he never asked any cable installation technicians whether he had workers' compensation coverage.

The undisputed evidence shows that the workers' compensation insurance that Plaintiff procured excluded Plaintiff from coverage, resulting in the issuance of a workers' compensation policy that did not provide any coverage for Plaintiff or anyone else. Despite this fact, Southeastern argues that it is "likely" that "[P]laintiff specifically sought a ghost policy." We do not, however, find the fact that Plaintiff

procured such a policy particularly relevant, since the undisputed evidence establishes that he procured insurance at Southeastern's insistence, making this fact merely a reaffirmation of Southeastern's position that Plaintiff was an independent contractor. "Where the work done, in its essence, follows the usual path of an employee, putting on an 'independent contractor' label does not take the worker from the protection of the Act." *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 729, 91 L. Ed. 1772, 1778, 67 S. Ct. 1473, 1476 (1947).

### c. Uniform and Vehicle Requirements

The undisputed record evidence establishes that Southeastern imposed requirements upon cable installation technicians, including Plaintiff, regarding the uniform he wore and the vehicle that he operated while on the job. According to Plaintiff, he was required to wear "Southeastern Cable work shirts that had a Southeastern Cable logo on one side, their name, and then [his] name on the other side." Mr. Hair confirmed Plaintiff's assertion, testifying that the cable installation technicians chose to procure uniforms from the "Santos" company and that the technicians paid $13.00 a week to have their uniforms laundered. In addition, Plaintiff was required to drive "a white vehicle" that was "newer than seven years" old and to affix a magnetic sign to its side that read "Southeastern Cable, Authorized Contractor for Time Warner." Aside from the fact that the imposition of these requirements suggests that Southeastern exerted control over Plaintiff's appearance, they also might convey the impression that Plaintiff was employed by Southeastern.

### C. Discussion

In light of the undisputed record evidence and the considerations discussed above, we make the following findings of jurisdictional fact:

1. Plaintiff was required to train for three weeks with one of Southeastern's supervisors before being assigned jobs.

2. Plaintiff did not negotiate any of the terms of his individual job assignments, which were determined solely by Southeastern and Time Warner. The cable installation technicians, including Plaintiff, were all paid the same percentage of the fee negotiated by Southeastern and Time Warner for each job completed.

3. Plaintiff was required to drive a particular type of vehicle displaying a magnetic sign advertising Southeastern and to wear a uniform bearing Southeastern's name.

**CAPPS v. SE. CABLE**

[214 N.C. App. 225 (2011)]

4. Plaintiff was required to use a specific set of tools. If Plaintiff did not have one of the tools on the list, Southeastern would provide Plaintiff with the required tool and deduct the cost of that tool from his pay.

5. Plaintiff was required to report in person to Southeastern's office on a daily basis to turn in paperwork and pick up his assignments.

6. Plaintiff was expected to work six days a week at jobs assigned by Southeastern.

7. Upon completion of his individual job assignments, Plaintiff was required to notify Time Warner, which would enter this information into a computer program that Southeastern accessed for the purpose of monitoring Plaintiff's progress during the course of the day.

8. Plaintiff's job assignment schedule depended upon the job assignments that Time Warner sent to Southeastern, was not subject to Plaintiff's control, and required him to complete each job within a particular two hour time period.

9. Plaintiff worked as part of a team of Southeastern technicians and reported to a supervisor.

Although these uncontradicted facts are arguably sufficient to establish that Plaintiff had an employer-employee relationship with Southeastern, we also make the following additional finding of jurisdictional fact in light of our resolution of various conflicts in the tone and tenor of the evidence:

It is undisputed that Southeastern required Plaintiff to complete a "Leave Request" form if he wanted to take time off. In light of its contents, we find that this form was a request for time off and not simply notification; that Plaintiff was required to ask his "supervisor" two weeks in advance for a day off; and that the supervisor had the option of approving or denying the request.

Based on these findings, we conclude that Plaintiff was an employee rather than an independent contractor. The factors that lead us to this conclusion include the fact that Plaintiff did not and could not operate an independent cable installation business, the fact that most aspects of Plaintiff's work schedule were controlled by or dependent upon Southeastern, the fact that the manner in which Plaintiff performed his work was controlled by Southeastern, either directly or

through its contract with Time Warner, and the fact that Southeastern asserted supervisory authority over and the right to discipline Plaintiff. As was stated in a recent, thoughtful decision by the United States District Court for the Eastern District of Louisiana:

> [W]ith regard to DirecTV, Plaintiffs . . . allege that DirecTV controlled their daily routines. They allege that DirecTV set the rate of compensation for each job, monitored their performance, and ultimately controlled their receipt of wages. Moreover, they claim that DirecTV and JP&D conducted background checks and drug tests at facilities of their choice. Humphreys also alleges in his declaration that he was required to wear a DirecTV uniform, give clients DirecTV paperwork, and have a DirecTV logo on his vehicle. . . . The allegations of DirecTV's control over the technicians, including control of their compensation, work assignments, and uniforms, all tend to indicate that the plaintiffs were employees of DirecTV.

*Lang v. DirecTV, Inc.*, 735 F. Supp. 2d 421, 433 (E.D. La. 2010), 2011 U.S. Dist. LEXIS 74674 (E. D. La. 2011) (denying defendants' motion to dismiss plaintiffs' claims).

In reaching this conclusion, we reject Defendant's contention that *Bowen v. Cra-Mac Cable Services*, 60 N.C. App. 241, 298 S.E.2d 760, *cert. denied*, 307 N.C. 696, 301 S.E.2d 388, (1983), requires us to reach a different outcome. First, *Bowen* did not address or resolve the issue of whether the claimant worked as an employee or a contractor, given that both parties treated the claimants as subcontractors, and instead focused our attention on whether, assuming that Plaintiff had independent contractor status, he might still be entitled to workers' compensation benefits on the basis of an estoppel theory. Secondly, there are a number of important factual distinctions between this case and *Bowen*, including the absence of any evidence that the claimant in *Bowen* had to obtain permission to take unpaid leave or that the defendant utilized a hierarchical structure with supervisors. As a result, we conclude that *Bowen* does not control the outcome of this case.

### III. Conclusion

Thus, for the reasons discussed above, we conclude that the greater weight of the evidence shows that Southeastern exerted the degree of control of Plaintiff that is characteristic of an employer's control over an employee; that, at the time Plaintiff was injured, he

was a Southeastern employee; and that the Commission erred in reaching a contrary conclusion. As a result, we reverse the Commission's jurisdictional decision and remand this case to the Commission for further proceedings not inconsistent with this opinion.[5]

REVERSED AND REMANDED.

Chief Judge MARTIN and Judge McGEE concur.

_____

5. Although Defendants argue that Plaintiff's claim is barred by N.C. Gen. Stat. § 97-19 on the grounds that, as an independent contractor, he was required to procure his own insurance, this aspect of Defendants' argument assumes that Plaintiff had a status which we have found that he did not, in fact, occupy. In addition, we are not persuaded that Plaintiff's decision to procure insurance operates to estop him from asserting that he should be treated as an employee given that he procured this insurance in light of Southeastern's decision to treat him as an independent contractor rather than an employee. Simply put, the fact that Plaintiff never asserted, independently of instructions that he received from Southeastern, that he was an independent contractor precludes us from reaching the conclusion that he was estopped from asserting employee, rather than independent contractor, status.