ROBERT D. LAWSON, EMPLOYEE, PLAINTIFF v. CONE MILLS CORPORATION, EMPLOYER, AND LIBERTY MUTUAL INSURANCE COMPANY, CARRIER, DEFENDANTS

No. 8310IC770

(Filed 15 May 1984)

**Master and Servant § 68— doctor's testimony failing to indicate plaintiff informed of occupational disease—finding of no jurisdiction improper**

> The Industrial Commission erred in dismissing plaintiff's claim for lack of jurisdiction on the ground that he failed to file his claim within two years after he was notified of the nature and work-related cause of his disease since plaintiff's doctor's testimony showed that he did not so inform plaintiff. An employee must be informed clearly, simply and directly that he has an occupational disease and that the illness is work-related to trigger the running of the two-year period set forth in G.S. 97-58. Plaintiff's doctor was so inexact in his diagnostic summary that he used the term "emphysema" and "chronic obstructive lung disease" interchangeably. Further, it was not enough for the medical authority to "assume" he told plaintiff his disease "may have been" work related since such a vague recollection by a physician should not serve to forever bar a worker from pursuing his claim for compensation.

APPEAL by plaintiff from Opinion and Award of the North Carolina Industrial Commission filed 11 April 1983. Heard in the Court of Appeals 2 May 1984.

Plaintiff was born on 20 June 1912. In 1941 he began working in Cone Mills' White-Oak plant. He worked there until 1953. He returned to work at the White-Oak site in 1956 and worked until 1957. He returned again in 1964 and worked until he left on sick leave in 1976. In June 1977 he formally retired from his employment. During most of his employment plaintiff worked in the spinning department six days a week and on the clean-up crews on Sundays. During the time plaintiff worked for the defendant employer the air in the mill was very dusty and dirty. Plaintiff also smoked during this period.

During his employment plaintiff began experiencing breathing problems including chest tightness, shortness of breath and a cough. During 1976, plaintiff consulted Dr. Ziessman about his breathing problem. Dr. Ziessman's diagnosis of and advice to plaintiff are the matters in controversy in this case.

On 19 December 1980, plaintiff filed a claim with the Industrial Commission for an occupational disease caused by ex-

posure to cotton dust. On 15 September 1981, defendants filed a motion to dismiss the claim on the basis that it was not filed within two years after the employee was informed by medical authority of his occupational disease, or within two years after his disability occurred. A hearing was held, and on 21 July 1982 a Deputy Commissioner entered an Opinion and Award dismissing plaintiff's claim for lack of jurisdiction, because he failed to file his claim within two years after his disability occurred or within two years after he was notified of the nature and work-related cause of his disease. Plaintiff appealed. On 11 April 1983 the Industrial Commission entered an Opinion and Award adopting the Opinion and Award of the Deputy Commissioner. Commissioner Clay dissented. Plaintiff appealed.

*McNairy, Clifford & Clendenin, by Michael R. Nash and Harry Clendenin, III, for plaintiff.*

*Smith, Moore, Smith, Schell & Hunter, by J. Donald Cowan, Jr. and Caroline Hudson, for defendants.*

WELLS, Judge.

The issue presented by this appeal is whether the Industrial Commission erred in dismissing plaintiff's claim because it was not timely filed. N.C. Gen. Stat. § 97-58 (1979) in pertinent part provides:

> . . .
>
> (b) . . . The time of notice of an occupational disease shall run from the date that the employee has been advised by competent medical authority that he has same.
>
> (c) The right to compensation for occupational disease shall be barred unless a claim be filed with the Industrial Commission within two years after death, disability, or disablement as the case may be. . . .

Our supreme court has held that when these provisions are interpreted *in pari materia* they require an employee who seeks to recover for disability resulting from an occupational disease to give notice or file a claim within two years of the time when he is first informed by competent medical authority of the nature and work-related cause of the disease. *Taylor v. Stevens & Co.*, 300 N.C. 94, 265 S.E. 2d 144 (1980). This two year statute of limitation

is a condition precedent with which plaintiff must comply in order to confer jurisdiction on the Industrial Commission to hear the claim. *Poythress v. J. P. Stevens*, 54 N.C. App. 376, 283 S.E. 2d 573 (1981), *disc. rev. denied*, 305 N.C. 153, 289 S.E. 2d 380 (1982).

Findings of fact by the Industrial Commission, except those relating to jurisdictional facts are conclusive on appeal when supported by any competent evidence even if there is evidence to support contrary findings. *Hilliard v. Apex Cabinet Co.*, 305 N.C. 593, 290 S.E. 2d 682 (1982). Findings of fact relating to jurisdiction are not conclusive even though supported by some evidence in the record. *Id.* The reviewing courts have a duty to make their own independent findings of jurisdictional facts based upon its consideration of the entire record. *Dowdy v. Fieldcrest Mills*, 308 N.C. 701, 304 S.E. 2d 215 (1983), *rehearing denied*, --- N.C. ---, 311 S.E. 2d 590 (1984).

The Deputy Commissioner made the following pertinent findings of fact which were adopted by the Industrial Commission:

. . .

3. In approximately 1966, plaintiff first noticed that he was having breathing problems. He became tired and short of breath easily. He began to experience chest tightness and developed a cough. His problems became progressively worse. (In April 1976, he was examined by Dr. Harvey A. Ziessman who diagnosed his condition as chronic obstructive pulmonary disease.) . . . (Dr. Ziessman told plaintiff that his condition was caused by cigarette smoking and probably cotton dust exposure from his employment in the mill.) . . . (He told plaintiff in either April or June, 1976 that plaintiff had "brown lung" and that cotton dust was a contributing factor in his lung disease so he should leave the mill.) . . . To the extent plaintiff's testimony differs from this finding, it is not found to be credible.

. . .

7. Plaintiff did not file his claim within two years after his disablement from his occupational lung disease or within two years after he was first informed by competent medical authority of the nature and work-related cause of the disease.

. . .

Commissioner Clay stated in his dissent that "the medical expert's testimony on what he told the plaintiff in 1976 is too vague and indeterminate to constitute a medical diagnosis."

In *Taylor v. Stevens & Co., supra,* the court made it clear that in order for the two year period to start running under G.S. § 97-58(b) and (c), plaintiff (1) had to be notified by competent medical authority of the nature of his disease and (2) that the cause of his disease was work-related. There is no dispute that plaintiff suffers from an occupational disease. The question we must decide is whether Dr. Ziessman informed plaintiff regarding the nature and work-related nature of his disease. The pertinent portions of Dr. Ziessman's testimony on these questions are as follows:

Q. (Mr. Cowan) Dr. Ziessman, has Mr. Robert David Lawson been a patient of yours?

A. Yes.

Q. Do you have his records with you?

A. Yes.

Q. Do you recall when you first saw Mr. Lawson?

A. The first time was April 16, 1976.

Q. What was the reason you saw Mr. Lawson at that time?

A. At that time he was complaining of shortness of breath, coughing, wheezing.

Q. Do your records reflect whether or not Mr. Lawson was working at that time?

A. He told me that he was planning to stop working as of July 1st.

Q. Do your records reflect that he was working in the textile industry at that time? Is that right?

A. That's right.

Q. Do your records reflect whether or not Mr. Lawson was smoking at that time?

A. Yes. At that time he said he was smoking about 8 to 10 cigarettes a day.

Q. This was in April of 1976?

A. Yes.

Q. Have you continued to see Mr. Lawson after April of 1976?

A. Yes. I've been seeing him on a regular basis since then.

Q. Okay. When was the last time you saw Mr. Lawson?

A. October 12, 1981. No. Yes. Yes. October 12, 1981.

Q. Dr. Ziessman, do you recall having a conversation with Mr. Lawson about the cause of his lung disease?

A. We've yes. We've talked about the factors that could be contributing to his lung disease.

Q. Let me refer you specifically, Dr. Ziessman, to your office records on June 4, 1976.

A. Yes.

Q. Would you relate to us, in your own words, what occurred during that visit with Mr. Lawson, as reflected in your office notes?

A. That was a follow-up visit to his first appointment, and other tests had been done after that first visit, and my *impression* at that time was that *he had chronic lung disease* that was *due* to smoking and *possibly cotton dust.*

Q. Did you discuss that with Mr. Lawson?

A. Yes.

Q. Tell us as best you recall, using your office notes to refresh your memory, if they do, the discussion you had with Mr. Lawson on June the 4th, 1976 about the cause of his chronic obstructive lung disease.

A. *Well, it's difficult to recall exactly the conversation we had. I know that I specifically told him not to smoke. He's already told me he's retiring so I'm sure I didn't press that issue any further,* and I told him I needed to see him in a couple of months and see how he's progressing under those two circumstances, no smoking and not working.

Q. Dr. Ziessman, I'm going to show you defendant's exhibit number 2, a copy of which I've already given to Mr. Clendenin, and ask you first if you recognize that?

A. Yes.

Q. Is that the original of a letter with your signature on it?

A. Yes.

Q. And does defendant's exhibit number 2, Dr. Ziessman, accurately summarize your office records and the conversation you've had with Mr. Lawson while he's been your patient?

A. It was meant to be a summary, yes.

Q. Would you read us, Dr. Ziessman, the second paragraph in defendant's exhibit number 2?

A. "It is clear from my records that we had discussed the underlying cause of his pulmonary disease, probably a combination of smoking and byssinosis."

Q. Would you tell us, as best as you recall, what you told Mr. Lawson more specifically in relation to the sentence you just read?

A. Well, really just basically what I said is that there's no doubt that smoking contributed to his chronic lung disease and very likely that cotton dust from where he was working also contributed to it.

Q. Do your records reflect when that conversation took place?

A. I suspect it was a combination of those first two visits. How much I told him the first time and how much I told him the second I don't remember details.

Q. It would have been either the April 1976 or the June 1976 visit.

A. Yes. *I can't tell from my notes how much in detail I went into it, but certainly I discussed it as far as I stated it.*

Q. And when you say discussed it as far as you stated it, tell us what you—

A. Well, *I also recommended that he stop smoking and that since he told me he stopped working I'm sure I didn't press that point any further.*

Q. Did you tell him, as best you recall Dr. Ziessman, why he should stop working in the textile mill?

A. Just because the cotton dust may, I assume and all I can do is assume, I didn't write specifically in my notes what I said but assuming by what I wrote in the diagnosis and what I wrote about my recommendations, *I assume that I told him that it was, although I didn't know how much, it was a contributing factor to his pulmonary dysfunction.*

Q. What was a contributing factor to his pulmonary dysfunction?

A. Both of them, the smoking and the cotton dust.

Q. Okay. Now, do you recall having a conversation with Mr. Lawson prior to June of 1977 where you discussed the probability or possibility of a collapsed lung?

A. No.

Q. Do you recall having a conversation with Mr. Lawson about emphysema?

A. Well, you know, *I use emphysema and chronic lung disease interchangeably, chronic obstructive pulmonary disease.*

. . .

CROSS EXAMINATION BY MR. CLENDENIN:

Q. Dr. Ziessman, a few minutes ago you said in response to a question from Mr. Cowan that you assumed these things you discussed with Mr. Lawson. Do I understand by that answer that you don't recall the specific conversations?

A. I recall, you know, I've seen him a number of times so I remember them all as sort of one conversation. I can't, in my mind, separate which was in April and which was in June and so on, but certainly we talked about those things. Sure.

Q. Are there any notations in your records to indicate a specific thing or specific things that you told the patient, Mr. Lawson? By that I mean do you have in your office records a notation saying told the patient this, told the patient that?

A. Sure. Well, my June office visit, June 4, 1976, what I wrote down in the records was no smoking parenthesis retired, and what that, you know, records are just reminders about what went on and essentially that means to me that I told him not to smoke and that since he was retiring that, you know, that factor was taken care of.

Q. You said that since he was retired you didn't press that issue. Does that mean that you would not have discussed in any detail with him his cotton mill employment because he was no longer in a cotton mill?

A. I know that we have talked about the cotton dust contributing to his pulmonary problem as that being a factor in contributing to it.

. . .

Q. Do your notes indicate whether you ever discussed with him the medical term byssinosis as opposed to the slang term brown lung?

A. It's probably unlikely that I used the term byssinosis. More likely I used the term brown lung, but I may have mentioned both of them. Certainly I didn't press the terminology, but certainly brown lung, for sure, was mentioned. Byssinosis may or may not have been.

Q. When you say you didn't press the terminology, what do you mean?

A. I just mean that I can't be sure that I said byssinosis, you know, I certainly would have said brown lung. I may have used the term byssinosis. At that time I was concerned about treating his symptoms and not so much with how much was due to what or terminology or that kind of thing.

. . .

(Emphasis added.)

An employee must be informed clearly, simply and directly that he has an occupational disease and that the illness is work-related to trigger the running of the two-year period set forth in G.S. § 97-58. *McKee v. Spinning Company*, 54 N.C. App. 558, 284 S.E. 2d 175, *disc. rev. denied*, 305 N.C. 301, 291 S.E. 2d 150 (1982). Dr. Ziessman's testimony shows that he did not so inform plaintiff. We are particularly concerned that Dr. Ziessman was so inexact in his diagnostic summary as to say that he used the terms "emphysema" and "chronic obstructive lung disease" interchangeably. Further, we emphasize that it is not enough for the medical authority to "assume" he told a worker his disease "may have been" work related. Such a vague recollection by a physician should not serve to forever bar a worker from pursuing his claim for compensation.

Given the vague and contradictory testimony of Dr. Ziessman, we agree with Commissioner Clay that the evidence fails to show that in 1976 plaintiff had been sufficiently informed of the nature and work relatedness of his disease to trigger the running of the two year period under the statute. If Dr. Ziessman's testimony shows anything, it shows that in 1976 not even he was completely convinced that plaintiff suffered from an occupational disease. This being the case, it would be unfair, inequitable, and wrong to bar plaintiff's recovery on jurisdictional grounds. We therefore vacate the Commission's Opinion and Award and remand for consideration of plaintiff's claim on the merits.

Vacated and remanded.

Judges BECTON and JOHNSON concur.