ELMORE, Judge.
*594 The North Carolina Industrial Commission dismissed plaintiff's claim for benefits for an occupational disease, concluding that plaintiff failed to timely file his claim pursuant to N.C. Gen.Stat. § 97-59(c). We affirm.
*595 I. Background
Ervin Rainey (plaintiff) worked as an automotive mechanic assistant for the City of Charlotte (defendant) for eighteen years, which required frequent strenuous use of his arms and shoulders. On 9 May 2000, plaintiff presented to Dr. H. Yates Dunaway, an orthopedic surgeon, for an evaluation of his right shoulder and knee. According to his medical report, plaintiff told Dr. Dunaway that his job requires heavy use of his shoulders to break down tires. The report also included Dr. Dunaway's diagnosis, "severe osteoarthritis right shoulder," and the following statement: "I have talked with [plaintiff] extensively about the likelihood of total shoulder arthroplasty in the near future. He will need to consider modifying his work."
Plaintiff declined surgical intervention and continued to work in his same position as an *768 automotive mechanic assistant for defendant. His shoulder problems persisted, however, and at times plaintiff had to request assistance from co-workers. On 1 December 2009, he retired due to pain in his left shoulder, which had rendered him incapable of performing his normal job functions.
On 1 October 2012, plaintiff presented to Dr. Roy Majors with a history of left shoulder pain, which dated back twelve years and had become worse in recent months. Dr. Majors diagnosed plaintiff with end-stage arthritis in his left shoulder and referred him to Dr. Nady Hamid for surgery. Dr. Hamid performed a left total shoulder arthroplasty on 5 November 2012 and wrote plaintiff completely out of work after the surgery.
Plaintiff filed a workers' compensation claim on 29 November 2012, alleging an occupational disease in his left shoulder. The deputy commissioner, and later the Full Commission, concluded that plaintiff had failed to file his claim within the requisite time period and dismissed for lack of jurisdiction. Plaintiff appeals.
II. Discussion
The sole issue on appeal is whether plaintiff filed his claim before the expiration of the two-year statute of limitations. "Whether the claim for an occupational disease was filed timely is an issue of jurisdiction for the commission." Terrell v. Terminix Servs., Inc., 142 N.C.App. 305, 307, 542 S.E.2d 332, 334 (2001). Our North Carolina Supreme Court has articulated the standard of review in cases involving challenges to the jurisdiction of the Industrial Commission:
*596 Except as to questions of jurisdiction, findings of fact by the Industrial Commission are conclusive on appeal when supported by competent evidence even though there is evidence to support contrary findings. G.S. 97-86 ; Morrison v. Burlington Industries, 304 N.C. 1, 282 S.E.2d 458 (1981). Findings of jurisdictional fact by the Industrial Commission, however, are not conclusive upon appeal even though supported by evidence in the record. Richards v. Nationwide Homes, 263 N.C. 295, 139 S.E.2d 645 (1965). A challenge to jurisdiction may be made at any time. Id. When a defendant employer challenges the jurisdiction of the Industrial Commission, any reviewing court, including the Supreme Court, has the duty to make its own independent findings of jurisdictional facts from its consideration of the entire record. Lucas v. Stores, 289 N.C. 212, 221 S.E.2d 257 (1976).
Dowdy v. Fieldcrest Mills, Inc., 308 N.C. 701, 705, 304 S.E.2d 215, 218 (1983).
N.C. Gen.Stat. § 97-58 (2015) establishes the time limit to file a claim for compensation for an occupational disease. Pursuant to subsection (c), the claim must be filed "within two years after death, disability, or disablement as the case may be." N.C. Gen.Stat. § 97-58(c) (2015). Subsection (b) further provides that "[t]he time of notice of an occupational disease shall run from the date that the employee has been advised by competent medical authority that he has [the] same." N.C. Gen.Stat. § 97-58(b) (2015). Our Supreme Court has construed these two subsections (b) and (c) in pari material to "establish the factors which commence the running of the two year period within which claims must be filed...." Dowdy, 308 N.C. at 706, 304 S.E.2d at 218. The two-year period begins to run
when [1] an employee has suffered injury from an occupational disease which renders the employee incapable of earning the wages the employee was receiving at the time of the incapacity by such injury, and [2] the employee is informed by competent medical authority of the nature and work related cause of the disease. The two year period for filing claims for an occupational disease does not begin to run until all of these factors exist.
Id. at 308, 304 S.E.2d at 218-19 (citing Taylor v. Stevens & Co., 300 N.C. 94, 265 S.E.2d 144 (1980) ).
*597 A. Informed by Competent Medical Authority
First, we must determine when plaintiff was informed by competent medical authority of the nature and work-related cause of his left shoulder condition. The Full Commission concluded that plaintiff had been adequately informed during his 9 May 2000 *769 evaluation with Dr. Dunaway. Plaintiff maintains, however, that his appointment with Dr. Dunaway was for his right shoulder only, and it was not until his visit with Dr. Majors on 1 October 2012 that plaintiff was informed of the occupational disease in his left shoulder.
During his deposition, Dr. Dunaway confirmed that it was his diagnosis of arthritis that would have led to a total shoulder arthroplasty. He also acknowledged that the nature of plaintiff's work, as referenced in his report, would require use of both shoulders. When asked about certain statements in his report concerning his plan for treatment, Dr. Dunaway testified as follows:
Q. You reference in the following sentence that "[plaintiff] will need to consider modifying his work," correct?
A. Correct.
Q. And what was the basis for writing that [plaintiff] would need to modify his work?
A. Recognizing he had this arthritis in his shoulder, we know that the heavier you use the joint, the more likely that arthritis is to be a problem and be symptomatic.
Q. And would that be the case for either of [plaintiff]'s shoulders?
A. I would think so.
Dr. Dunaway admitted that he had no independent recollection of the examination apart from his report, though he believed he told plaintiff to consider modifying his work:
A. .... usually when I make a sentence like that, then I discuss that with the patient.
Q. Any reason to doubt you discussed with [plaintiff] that he needed to modify his employment?
A. No reason that I'm aware of.
*598 Q. Okay. And would you have discussed with [plaintiff] the reason that you felt he needed to modify his employment, in light of the employment activities he did?
A. Yeah. I'm assuming. Obviously, I don't remember this. But as is usually my practice, we talk about the diagnosis, what the potential outcomes might be, and how you might modify that, to alter that outcome.
As to his conversations with plaintiff regarding the cause of his shoulder problems, Dr. Dunaway offered the following testimony:
Q. Okay. In your medical opinion, was the occasional heavy use, breaking down tires, aggravating the arthritis in his shoulders?
A. That would have been my opinion, I think.
....
Q. And you discussed with him that his occasional heavy use, breaking down tires, could be contributing to that pain that he was having in his shoulders-
A. Correct.
Q. -and was contributing to the symptoms from his arthritis in his shoulders?
A. Correct.
While we are cautious to rely solely on statements that Dr. Dunaway "assumed" to have made or details that he "would think" to be true, see Lawson v. Cone Mills Corp., 68 N.C.App. 402, 410, 315 S.E.2d 103, 108 (1984) ("[I]t is not enough for the medical authority to 'assume' he told a worker his disease 'may have been' work related."), plaintiff's own testimony tends to corroborate Dr. Dunaway's recollection of the examination.[1] According to plaintiff, Dr. Dunaway evaluated and made recommendations pertaining to both the right and left shoulders:
*599 Q. If we were to represent to you that Dr. Dunaway recommended a total shoulder replacement-
A. Yeah, both-he said both.
Q. -in 2000- *770 A. Uh-huh.
Q. -do you remember that conversation with the doctor?
A. Yes, I remember that, yeah.
....
Q. Tell us about the conversation you had with Dr. Dunaway about you'll eventually need a total shoulder replacement.
A. Well, when I went there and after he put me in this machine and-you know, and checked me out, then he told me-he said, "Well, you might as well get ready to retire from the City, because you're going to have-both of your shoulders going [sic] to have to be replaced."
On cross-examination, plaintiff again stated that Dr. Dunaway had recommended replacement surgery for both shoulders:
Q. And the-you indicated that you saw Dr. Dunaway, and I think we've got his medical record, and I think Mr. Sumwalt indicated that was in the year 2000.
....
Q. The-he was recommending you need shoulder replacement surgery to your right shoulder, wasn't he?
A. No, he didn't speculate-he said both shoulders.
Plaintiff further testified that Dr. Dunaway told him that his job was causing his shoulder problems:
Q. Just so that I'm clear-
THE WITNESS: Okay.
Q. -when you and I were talking earlier-
A. Uh-huh.
Q. -you mentioned a doctor, sometime while you were employed by the City, who basically told you your job duties were hurting both your shoulders.
*600 A. He might have did, but I had to keep on working. I couldn't stop.
Q. And I don't want to know "he might of did"-did he?
A. Yeah, he did.
....
Q. And did-did Dr. Dunaway indicate that if you kept doing your job, you're going to need shoulder replacement surgery?
A. Yes.
Q. And that would indicate to you that your job is-is going to cause shoulder replacement-
A. Yes.
Q. -shoulder surgery? So when Dr. Dunaway told you that, was that not an indication to you that your job was the cause of your shoulder problems?
A. Oh, yeah. He-yeah, he said, yeah.
Q. So it wasn't-it wasn't just Dr. Hamid. It was-
A. Yeah.
Q. -Dr. Dunaway-
A. Yeah.
Q. -years before?
A. Yeah, but I couldn't-I couldn't stop, though. I had to work.
Q. Understood. I just want to make sure that I-
A. Yes.
Q. -understand it was not just Dr. Hamid-
A. Oh, okay.
Q. -it was Dr. Dunaway, too.
A. Okay.
Q. Agreed?
*601 A. Yes, right.
Based on the foregoing, we conclude that plaintiff was informed by Dr. Dunaway on 9 May 2000 of the nature and work-related cause of his left shoulder injury.
B. Time of Disability
Next, we must determine when plaintiff became "disabled"-that is, when "an employee has suffered injury from an occupational disease which renders the employee incapable of earning the wages the employee was receiving at the time of the incapacity by such injury. " Dowdy, 308 N.C. at 706, 304 S.E.2d at 218 (emphasis added) (citation omitted). The Full Commission concluded that plaintiff was disabled on 1 December 2009, the date of his retirement. While neither party disputes that plaintiff has had no meaningful employment since he retired, plaintiff asserts that "retirement is irrelevant *771 to any analysis of disability," and that he could not have been disabled before 5 November 2012-the date that Dr. Hamid imposed medical restrictions on plaintiff's ability to work.
We reject plaintiff's argument that medical restrictions are the only competent evidence of disability, or as he states, "when there are no medical restrictions 'because of' a compensable injury or disease, 'disability' does not exist as a matter of law." On the contrary, "[t]his Court has previously held that an employee's own testimony as to pain and ability to work is competent evidence as to the employee's ability to work." Byrd v. Ecofibers, Inc., 182 N.C.App. 728, 731, 645 S.E.2d 80, 82 (2007) (citing Boles v. U.S. Air, Inc., 148 N.C.App. 493, 499, 560 S.E.2d 809, 813 (2002) ; Matthews v. Petroleum Tank Serv., Inc., 108 N.C.App. 259, 265, 423 S.E.2d 532, 536 (1992) ; Niple v. Seawell Realty & Indus. Co., 88 N.C.App. 136, 139, 362 S.E.2d 572, 574 (1987), disc. review denied, 321 N.C. 744, 365 S.E.2d 903 (1988) ).
Moreover, unlike those cases cited by plaintiff, in which retirement was wholly unrelated to the occupational disease, e.g., Stroud v. Caswell Ctr., 124 N.C.App. 653, 654-55, 478 S.E.2d 234, 235 (1996), here plaintiff testified repeatedly that he stopped working for defendant because of the pain in his left shoulder:
Q. Okay. What went into your decision to retire from the City?
A. Well, I was up under the truck-most of the time, after I got through changing tires, I used to go up under the fire truck and I had to put a bottle jack under there and jack *602 it up-you know, crawl up under there, and when I laid on my shoulder, you know-I mean, it hurt so bad, I said, "Look, I got to quit." That's why I retired. I said, "Man, I got to get out of here. I cannot make it," you know. I had to crawl back from under the truck, and that's why I retired.
Q. And why, specifically, did that bother you-what about that activity?
A. When I-when I turned on this side (indicating), this shoulder right here (indicating), I couldn't-you know, I couldn't hardly-I couldn't use this shoulder, even when-
Q. And you're pointing to your left shoulder?
A. Yeah, my left shoulder right here.
We agree with the Full Commission, therefore, that on 1 December 2009, plaintiff was disabled within the meaning of the Worker's Compensation Act.
III. Conclusion
We conclude that, as of 1 December 2009, plaintiff had suffered injury from an occupational disease which rendered him incapable of earning the wages he was receiving at the time of his incapacity, and had been informed by competent medical authority of the nature and work-related cause of the disease. Because he did not file his worker's compensation claim until 5 November 2012, plaintiff's claim was barred by the two-year statute of limitations under N.C. Gen.Stat. § 97-58(c). We affirm the Full Commission's dismissal for lack of jurisdiction.
AFFIRMED.
Judges STROUD and DIETZ concur.

We do not treat plaintiff's own adverse testimony as a "judicial admission," as argued by defendant, but as an "evidentiary admission." The difference being that under the latter approach, the testimony is "admissible in evidence against such party, but ... may be rebutted, denied, or explained away and is in no sense conclusive." Woods v. Smith, 297 N.C. 363, 373-74, 255 S.E.2d 174, 181 (1979) ; cf. Cogdill v. Scates, 290 N.C. 31, 44, 224 S.E.2d 604, 611 (1976) ("If at the close of the evidence, a plaintiff's own testimony has unequivocally repudiated the material allegations of his complaint and his testimony has shown no additional grounds for recovery, ... the defendant's motion for directed verdict should be allowed." (emphasis added)).