IN THE COURT OF APPEALS OF NORTH CAROLINA

2022-NCCOA-57

No. COA20-895

Filed 1 February 2022

Industrial Commission, No. 18-001070

DARRYL RIMMER, Employee, Plaintiff,

v.

TOWN OF CHAPEL HILL, Employer, NORTH CAROLINA INTERLOCAL RISK MANAGEMENT AGENCY (NCIRMA), Administered by THE NORTH CAROLINA LEAGUE OF MUNICIPALITIES, Carrier; Defendants.

Appeal by Plaintiff from opinion and award entered 10 September 2020 by the North Carolina Industrial Commission. Heard in the Court of Appeals 19 October 2021.

*Patterson Harkavy LLP, by Christopher A. Brook, Henry N. Patterson, and Paul E. Smith, for Plaintiff-Appellant.*

*Teague Campbell Dennis & Gorham, LLP, by Dayle A. Flammia and Lindsay A. Underwood, for Defendants-Appellees.*

*Edelstein and Payne, by M. Travis Payne, for amicus curiae Professional Fire Fighters and Paramedics of North Carolina.*

*The McGuinness Law Firm, by J. Michael McGuinness, for amici curiae North Carolina Police Benevolent Association and Southern States Police Benevolent Association.*

COLLINS, Judge.

Plaintiff Darryl Rimmer appeals from an Opinion and Award of the Industrial

Commission denying his claim for workers' compensation benefits for his post-traumatic stress disorder ("PTSD"). Plaintiff argues that the Commission erred by concluding that his claim was barred by his failure to timely give notice of his PTSD to his employer and to timely file his claim. We reverse and remand for a determination of the merits of Plaintiff's claim.

## I.    Background

Plaintiff joined the Chapel Hill Fire Department ("CHFD") as a firefighter on 20 June 1995. Plaintiff first worked "as a member of a crew of three to five people" with "general fire fighting duties" and then as a "driver/operator." In 2000, Plaintiff was promoted to the rank of captain and became responsible for overseeing "a crew, a truck, and a station."

On 9 December 2002, Plaintiff was struck by falling debris while fighting a house fire and briefly lost consciousness. Following this incident, Plaintiff filed a workers' compensation claim for injuries to his cervical spine and left shoulder. The claim was accepted as compensable. Plaintiff was entirely out of work from 10 December 2002 through 31 March 2003, and then worked on light duty through 17 July 2003. Plaintiff returned to full duty with no restrictions on 18 July 2003.

In either late 2003 or early 2004, Dr. Brian Benjamin, Plaintiff's family doctor, referred Plaintiff for a neurocognitive evaluation due to "a one-year history of cognitive and behavioral changes following" the December 2002 incident.

Neuropsychologist Dr. Kristine Herfkens evaluated Plaintiff on 6 January 2004. In her report, Dr. Herfkens noted that Plaintiff "complained of poor concentration and memory, difficulty learning new information, and a 'spacey feeling.' He particularly struggles with sustaining his attention on longer, slower tasks." Dr. Herfkens also noted that,

> In the past, [Plaintiff] has had problems with work related depression and PTSD. He sought treatment, and improved considerably. He has been told that his cognitive problems may be related to mild depression, but he does not feel like he did in the past when he was depressed and anxious.

Dr. Herfkens recorded that Plaintiff "reported a history of depression and PTSD related to events in his work as a firefighter."

Dr. Herfkens concluded that it was "possible that [Plaintiff] has mild residual depressive and PTSD symptoms as a result of" the December 2002 incident. Her "diagnostic impressions" included "Post concussion syndrome, mild"; "Depression NOS"; and "Anxiety NOS."[1] After a follow-up appointment with Plaintiff on

---

[1] "NOS," though not defined in the record, appears to be an abbreviation for "Not Otherwise Specified." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* at 4 (4th ed. 2000). "NOS" was a category of diagnosis applicable where (1) "[t]he presentation conforms to the general guidelines for a mental disorder in the diagnostic class, but the symptomatic picture does not meet the criteria for any of the specific disorders"; (2) "[t]he presentation conforms to a symptom pattern that has not been included in the DSM-IV Classification but that causes clinically significant distress or impairment"; (3) "[t]here is uncertainty about etiology"; or (4) "[t]here is insufficient opportunity for complete data collection . . . or inconsistent or contradictory information, but there is enough information to place it within a particular diagnostic class." *Id.*

20 January 2004, Dr. Herfkens noted that Plaintiff "continues to be bothered by forgetfulness + fatigue."

¶ 6        In notes dated 5 February 2004, Dr. Benjamin listed Plaintiff's "Problem #1" as "Closed head injury."  Dr. Benjamin wrote:

> S:  Mr. Rimmer still continues to suffer from the sequelae of the injuries he suffered on 12/9/02 . . . .  He did lose consciousness, and suffered significant problems.  Many of the physical problems have improved; however, he still is experiencing a post concussive syndrome with reduction in his cognitive function, and resultant post traumatic stress disorder symptoms of depression and anxiety.  This was confirmed by neuropsychological testing done by Dr. H[e]rfkens.  Please refer to her report, dated 1/6/04.
> . . . .
>
> A:  Post concussive syndrome with resultant post traumatic stress disorder, anxiety disorder, and depression.
>
> P:  He will continue to work with his environment, and enacting Dr. H[e]rfkens recommendations.  We are going to start him on Effexor XR . . . and I will see him back in 2-3 weeks.

When asked if he recalled that "it was [Dr. Benjamin's] assessment that [he was] suffering from Post-Concussive Syndrome, with resultant Post-Traumatic Stress Disorder, anxiety disorder, and depression," Plaintiff responded, "If that's in the notes – again, 2004 is a long time ago for me to remember, but I would say yes."

¶ 7        In notes dated 4 March 2004, Dr. Benjamin listed Plaintiff's "Problem #1" as "Depression, anxiety, and closed head injury."  Dr. Benjamin noted that Plaintiff was

experiencing "[m]ild anxiety and depression" but was "doing well," "sleeping some better at nighttime," and had an improved mood.

¶ 8    Plaintiff served as a captain with the CHFD until 2012, when he requested assignment as an assistant fire marshal. In this role, Plaintiff was required to conduct "fire inspections and investigations" and "report to active fires and other significant incidents like multiple vehicle car accidents or hazardous materials incidents." Plaintiff's duties at an active scene included "patrolling the scene, listening for radio traffic, and monitoring the structure for signs of fire extension, structural failure, or other hazards."

¶ 9    In the spring of 2017, following a call involving two dogs burning in a fire, Plaintiff started vomiting "on almost a daily basis" when he arrived at work, opened the door of his vehicle, and smelled his gear. Plaintiff began suffering anxiety and panic attacks, particularly upon going into the town of Chapel Hill. Plaintiff also began experiencing intrusive thoughts of "victims of fires and accidents he had responded to over his years of service" and "nightmares which severely disrupted his sleep, limiting him to one to two hours of sleep per night." Plaintiff's intrusive thoughts and nightmares concerned calls spanning his career with the CHFD, including: Plaintiff's participation in "salvage and overhaul operations" and the removal of victims' bodies following a 1996 fire at the Phi Gamma Delta fraternity, response to a 1997 mobile home fire where Plaintiff found a father who had attempted

to shield his son, discovery of the body of a college student who died by suicide in 1998, response to a victim who had fallen down an elevator shaft in either 1998 or 1999, involvement in resuscitation efforts for an accident victim while the victim's spouse "beat on [Plaintiff's] chest and called [Plaintiff] an animal" sometime between 2006 and 2008, discovery of an elderly decedent who had been severely neglected in approximately 2008, and participation in victim recovery efforts after a 2009 explosion at the Garner ConAgra plant.

¶ 10 On 9 October 2017, "[a]fter approximately six months of emotional symptoms," Plaintiff explained his difficulties to two of his superiors, Chief Matthew Sullivan and Fire Marshal Thomas Gregory. Sullivan and Gregory referred him to the Employee Assistance Program.

¶ 11 Plaintiff saw licensed professional counselor Mary Livingston Azoy through the Employee Assistance Program on 11 October 2017. Azoy wrote in her notes for this visit that Plaintiff had "developed severe PTSD as a result of cumulative trauma on the job," with "[s]ymptoms worsening over last 6 months." The notes, which spanned three visits and which Azoy did not sign until 2 March 2018, list Plaintiff's diagnosis as PTSD. Azoy told Plaintiff at his first appointment that he "needed to seek the help of a psychiatrist[.]"

¶ 12 Plaintiff saw Dr. Hansen Su, a psychiatrist, for an evaluation on 30 October 2017. In notes from this visit, Dr. Su wrote that Plaintiff had a "reported hx of PTSD,

related to his line of work as a firefighter." Dr. Su noted that Plaintiff "[r]eports long hx of symptoms which have worsened in the past several months. More nightmares, flashbacks, distortions of perception, hyperarousal, memory loss, poor concentration." Dr. Su's notes also indicate "[n]o history of psychiatric issues." Dr. Su testified that this information came from Plaintiff's own self-reporting. Dr. Su's notes reflect diagnoses of "Post-traumatic stress disorder, unspecified"; "Other depressive episodes"; and "Major depressive disorder, single episode, unspecified[.]" Plaintiff continued to see Dr. Su regularly.

¶ 13        Plaintiff began treatment with Gregory Allen, a licensed clinical social worker, on 7 November 2017. Allen's notes from this visit list a diagnosis of "[p]ost-traumatic stress disorder, unspecified." Allen wrote that Plaintiff "has been suffering with PTSD symptoms for several years now. About six months ago they became very bad again. . . . [Plaintiff] states he has been experiencing the problem(s) for 6 months." Allen also wrote that Plaintiff had "PTSD: Diagnosed at age 35. Received Outpatient Treatment at age 35." Allen indicated that Plaintiff has "a history of being treated for PTSD symptoms since 2002." Allen explained these entries during his deposition:

> Q. And were you aware that as early as 2002, after a work comp injury, and from 2002 to 2004, during that time period, [Plaintiff] was diagnosed with depression and PTSD?
>
> A. Yeah.

Q. How did you know that?

A. He talked about it.

. . . .

Q. But you are aware that he was diagnosed with PTSD as early as early 2000s, weren't you?

A. Yeah. I would imagine that -- what he was going through, yeah.

Plaintiff continued to see Allen regularly for outpatient therapy.

¶ 14 On 18 December 2017, Plaintiff requested his diagnosis and prognosis during an appointment with Dr. Su. On 22 December 2017, Plaintiff emailed Chief Sullivan and Human Resources Director Clifton Turner to inform them of his request from Dr. Su. In the email, Plaintiff wrote that Dr. Su had advised him that his "diagnosis was PTSD and [his] prognosis was very poor as to whether [he] would return to duty." Plaintiff further wrote that Dr. Su "advised this illness is due to [his] career in the fire service and is related to [his] job."

¶ 15 On 2 January 2018, Plaintiff filed a claim seeking workers' compensation benefits for "[p]sychological disability diagnosed as Post-Traumatic Stress Disorder" caused by "traumatic exposures in [his] job as a firefighter" with the CHFD. After Defendants denied the claim, Plaintiff sought a hearing before the Industrial Commission.

¶ 16 Prior to the hearing, Defendants referred Plaintiff to Dr. Moira Artigues, a

general and forensic psychiatrist, who conducted an interview and examination with Plaintiff on 5 September 2018. Dr. Artigues gave her opinion that, to a reasonable degree of medical certainty, Plaintiff's symptoms met the criteria for PTSD in the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition. Dr. Artigues noted that Plaintiff "said that he saw a psychiatrist or a psychologist for one to two appointments" after the 1996 fraternity fire and "recalled having nightmares at that time." Dr. Artigues further noted that Plaintiff "said he eventually got over his symptoms through talking with coworkers" and "[b]etween 1996 and 2016, [Plaintiff] said he did not have much in the way of symptoms except for minor increases in his anxiety." Dr. Artigues reviewed Plaintiff's primary care records dating back to 2014 and found that "[o]f note, there was no documentation of any psychiatric symptoms[.]" Upon reviewing Dr. Herfkens' report, Dr. Artigues surmised that Plaintiff may have self-reported suffering from PTSD; Dr. Artigues could not determine "if a doctor actually diagnosed him with PTSD or if he [was] self-diagnosed[.]"

¶ 17        The Deputy Commissioner held a hearing and entered an Opinion and Award on 5 June 2019. The Deputy Commissioner found, contrary to Defendants' assertion, that Plaintiff was not advised by a competent medical authority that he had PTSD in 2004. Accordingly, the Deputy Commissioner concluded that Plaintiff's claim was not barred by failure to timely give notice of his PTSD to Defendants, as required by N.C. Gen. Stat. § 97-22, or by failure to timely file his claim, as required by N.C. Gen. Stat.

§ 97-58(c). In the alternative, the Deputy Commissioner found that Plaintiff had shown a reasonable excuse for not having given written notice in 2004 and Defendants had not shown that they were prejudiced by any failure of notice. The Deputy Commissioner concluded that Plaintiff's PTSD was a compensable occupational disease resulting from Plaintiff's exposure to cumulative trauma in his job with the CHFD and awarded Plaintiff temporary total disability compensation, payment for treatment and counseling, and costs of the action.

¶ 18    Defendants appealed to the full Commission, which held a hearing and entered an Opinion and Award on 10 September 2020. The Commission concluded that Plaintiff failed to timely give notice of his PTSD to Defendants and failed to timely file his claim. The Commission also concluded that Plaintiff did not establish a reasonable excuse for the failure to timely notify Defendants, and Defendants were prejudiced by the late notice. The Commission denied Plaintiff's claim. Plaintiff appealed to this Court.

## II.    Discussion

¶ 19    Plaintiff argues that the Commission's opinion and award denying his claim must be reversed because he timely gave Defendants notice of his PTSD diagnosis in 2017 and timely filed his claim for compensation.

¶ 20    This Court's review of an opinion and award of the Industrial Commission is generally "limited to consideration of whether competent evidence supports the

Commission's findings of fact and whether the findings support the Commission's conclusions of law." *Richardson v. Maxim Healthcare/Allegis Grp.*, 362 N.C. 657, 660, 669 S.E.2d 582, 584 (2008) (citations omitted). Where the Commission's "findings of fact are not challenged and do not concern jurisdiction, they are binding on appeal." *Medlin v. Weaver Cooke Const., LLC*, 367 N.C. 414, 423, 760 S.E.2d 732, 738 (2014) (citing N.C. Gen. Stat. § 97-86). Jurisdictional findings of fact, however, are "not conclusive on appeal, even if supported by competent evidence." *Perkins v. Arkansas Trucking Servs.*, 351 N.C. 634, 637, 528 S.E.2d 902, 903-04 (2000) (citations omitted). Instead, "'[t]he reviewing court has the right, and the duty, to make its own independent findings of such jurisdictional facts from its consideration of all the evidence in the record.'" *Id.* (quoting *Lucas v. Li'l Gen. Stores*, 289 N.C. 212, 218, 221 S.E.2d 257, 261 (1976)).

> In performing our task to review the record *de novo* and make jurisdictional findings independent of those made by the Commission, we are necessarily charged with the duty to assess the credibility of the witnesses and the weight to be given to their testimony, using the same tests as would be employed by any fact-finder in a judicial or quasi-judicial proceeding.

*Morales-Rodriguez v. Carolina Quality Exteriors, Inc.*, 205 N.C. App. 712, 715, 698 S.E.2d 91, 94 (2010). "This Court makes determinations concerning jurisdictional facts based on the greater weight of the evidence." *Capps v. Se. Cable*, 214 N.C. App. 225, 227, 715 S.E.2d 227, 229 (2011) (citation omitted). We review the Commission's

conclusions of law de novo. *Medlin*, 367 N.C. at 423, 760 S.E.2d at 738.

¶ 21    An employee's PTSD may be compensable as an occupational disease under the Workers' Compensation Act if it is "proven to be due to causes and conditions which are characteristic of and peculiar to a particular trade, occupation or employment" and is not an "ordinary disease[] of life to which the general public is equally exposed outside of the employment." N.C. Gen. Stat. § 97-53(13) (2020); *see also Smith-Price v. Charter Pines Behav. Ctr.*, 160 N.C. App. 161, 171, 584 S.E.2d 881, 888 (2003) (holding the employee's PTSD fell within the statutory definition of occupational disease). Generally, no compensation for an occupational disease "shall be payable unless" the employee gives written notice to the employer within 30 days or "reasonable excuse is made to the satisfaction of the Industrial Commission for not giving such notice and the Commission is satisfied that the employer has not been prejudiced thereby." *See* N.C. Gen. Stat. § 97-22 (2017) (requiring injured employees to give notice of accident); *id.* § 97-58(b) (2017) (providing that the notice requirement in section 97-22 is applicable "in all cases of occupational disease except in case[s] of asbestosis, silicosis, or lead poisoning"). The 30-day period in which an employee must give notice of an occupational disease runs "from the date that the employee has been advised by competent medical authority that he has the same." *Id.* § 97-58(b).

¶ 22    An employee seeking compensation for an occupational disease must also file

a claim "with the Industrial Commission within two years after death, disability, or disablement as the case may be." *Id.* § 97-58(c) (2017). Our Supreme Court has construed section 97-58 to provide that this two-year period

> begins running when an employee has suffered injury from an occupational disease which renders the employee incapable of earning the wages the employee was receiving at the time of the incapacity by such injury, and the employee is informed by competent medical authority of the nature and work related cause of the disease. The two year period for filing claims for an occupational disease does not begin to run until all of these factors exist.

*Dowdy v. Fieldcrest Mills, Inc.*, 308 N.C. 701, 706, 304 S.E.2d 215, 218-19 (1983). "An employee must be informed clearly, simply and directly that he has an occupational disease and that the illness is work-related" to trigger the two-year period. *Lawson v. Cone Mills Corp.*, 68 N.C. App. 402, 410, 315 S.E.2d 103, 107 (1984) (citations omitted).

¶ 23     Because the two-year period for filing claims under section 97-58(c) "is a condition precedent with which a claimant must comply in order to confer jurisdiction on the Industrial Commission," whether a plaintiff timely filed a claim is a "jurisdictional finding[] of fact fully reviewable by this Court." *Dowdy*, 308 N.C. at 704-05, 304 S.E.2d at 218; *see also Rainey v. City of Charlotte*, 247 N.C. App. 594, 595, 785 S.E.2d 766, 768 (2016) (holding that the timely filing of an occupational disease claim under section 97-58(c) is "an issue of jurisdiction for the commission");

*Reinhardt v. Women's Pavilion, Inc.*, 102 N.C. App. 83, 86, 401 S.E.2d 138, 140 (1991) ("[T]he timely filing of a claim for compensation is a condition precedent to the right to receive compensation and failure to file timely is a jurisdictional bar for the Industrial Commission.").

¶ 24     We first determine when plaintiff was informed by competent medical authority of the nature and work-related cause of his PTSD. *See Dowdy*, 308 N.C. at 710, 304 S.E.2d at 221; *Rainey*, 247 N.C. App. at 597, 785 S.E.2d at 768. Plaintiff first saw Azoy through the Employee Assistance Program on 11 October 2017; Azoy directed Plaintiff to seek treatment with a psychiatrist. Though Azoy's notes reflect a diagnosis of PTSD, those notes were not signed until 2 March 2018, and there is no indication that Azoy communicated a diagnosis to Plaintiff.

¶ 25     Plaintiff began treatment with Dr. Su on 30 October 2017 and then with Allen on 7 November 2017. Plaintiff sought his diagnosis and prognosis from Dr. Su on 18 December 2017 and four days later emailed Sullivan and Turner that Dr. Su's "diagnosis was PTSD," Plaintiff's "prognosis was very poor as to whether [he] would return to duty," and Plaintiff's illness was "due to [his] career in the fire service and is related to [his] job." The greater weight of the evidence shows that Plaintiff was not clearly, simply, and directly informed of the nature and work-related cause of his present PTSD by competent medical authority until 18 December 2017.

¶ 26        Defendants argue that Plaintiff was informed by competent medical authority of the nature and work-related cause of his PTSD in or before 2004. This argument is without merit.

¶ 27        Defendants rely in significant part on the four records from Dr. Herfkens and Dr. Benjamin. Defendants contend that when Plaintiff "saw Dr. Herfkens in 2004" he "had a noted history of depression and PTSD, which [Dr. Herfkens] stated were diagnosed as a result of [Plaintiff's] employment." Defendants overstate the contents of Dr. Herfkens' report and notes. In her 6 January 2004 report, Dr. Herfkens wrote only that it was "possible that [Plaintiff] has mild residual depressive and PTSD symptoms as a result of" the December 2002 incident. Dr. Herfkens' "diagnostic impressions" did not include PTSD and her notes from Plaintiff's 20 January 2004 follow-up appointment did not mention PTSD. While Dr. Herfkens indicated that Plaintiff had "reported a history of depression and PTSD related to events in his work as a firefighter," she neither wrote nor testified that she or another medical provider had diagnosed Plaintiff with PTSD.

¶ 28        Defendants' own expert, Dr. Artigues, opined that Dr. Herfkens' records may have reflected Plaintiff's self-report of suffering from PTSD symptoms. Dr. Artigues testified that based on these records, she could not determine "if a doctor actually diagnosed him with PTSD or if he self-diagnosed[.]" Plaintiff's own testimony suggests that he may have self-reported in the past; he explained that when he first

"open[ed] up" about his condition in 2017, he was self-reporting based on his understanding of PTSD, and he had used the term PTSD "for lack of better words." Evidence indicating Plaintiff self-reported that he had PTSD symptoms or PTSD falls short of showing that Plaintiff was advised by competent medical authority that he had work-related PTSD. *See Terrell v. Terminix Servs.*, 142 N.C. App. 305, 308, 542 S.E.2d 332, 335 (2001) (the Workers' Compensation Act "does not require an employee to diagnose himself or file a claim based on his own suspicions").

¶ 29        Defendants also state that Dr. Benjamin "specifically diagnosed post-concussive syndrome with resultant PTSD, anxiety disorder, and depression in February 2004." Dr. Benjamin's 5 February 2004 notes include one line which states, "A: Post concussive syndrome with resultant post traumatic stress disorder, anxiety disorder, and depression." However, Dr. Benjamin expressly noted that he had referred to and relied on the report in which Dr. Herfkens found only that it was "possible" that Plaintiff had residual depressive and PTSD "symptoms" as a result of the December 2002 incident. Additionally, the lack of reference to PTSD in Dr. Benjamin's notes from a follow-up visit with Plaintiff just weeks later indicates that Dr. Benjamin had not in fact diagnosed Plaintiff with PTSD.

¶ 30        Dr. Benjamin's 5 February 2004 notes otherwise state that Plaintiff suffered a "post concussive syndrome" with "symptoms" of PTSD. This too is insufficient to show that Plaintiff was advised by competent medical authority that he had work-related

PTSD in 2004. Instead, the evidence suggests that Plaintiff may have been informed that he was experiencing symptoms of PTSD in 2004 without a formal diagnosis of work-related PTSD. Dr. Artigues testified that "most of the time . . . people have some symptoms along the way, and then PTSD declares itself." Dr. Artigues further explained that a person may initially have "subclinical PTSD" which presents "some symptoms of PTSD" but does not meet all the criteria for diagnosis.

¶ 31 Defendants also argue that Allen's records and testimony demonstrate that Plaintiff was informed by competent medical authority of the nature and work-related cause of his PTSD in or before 2004. Allen's notes from his assessment of Plaintiff state, "PTSD: Diagnosed at age 35. Received Outpatient Treatment at age 35" under the heading "Psych & SA Dx – Past and Present." But when asked to confirm that he was "aware that [Plaintiff] was diagnosed with PTSD as early as early 2000s," Allen responded only, "Yeah. I would imagine that -- what he was going through[.]" Allen's equivocal deposition testimony undercuts the assertion in his notes that Plaintiff was diagnosed with PTSD at age 35. Moreover, Allen did not identify any particular individual as a "competent medical authority" responsible for the purported early 2000s diagnosis of PTSD, or reveal the extent of information, if any, that Plaintiff was given concerning such a diagnosis. This evidence therefore fails to establish that by 2004, competent medical authority informed Plaintiff of the

nature and work-related cause of the trauma-related PTSD that he is now experiencing.

¶ 32      Defendants contend that "all of the traumatic events which [Plaintiff] points to, which he indicates caused his conditions and symptoms, took place well before [Plaintiff] moved to the administrative position of fire marshal" in 2012, "with the most recent cited event taking place in 2009[.]" Yet the record demonstrates that even after these dates, Plaintiff was still required to respond to "active fires and other significant incidents" and experienced further trauma which contributed to his condition. In particular, Plaintiff identified the spring of 2017 fire which killed two dogs as precipitating some of his symptoms:

> [I]t was the smell that I remember. It's burnt hair, burnt flesh. I was proud that day because I sat and watched our Fire Fighters bury those – that family's animals in their yard. . . . But that smell, it stayed . . . . And it was shortly after that that I opened my car door one day and the smell hit me and I vomited in the woods behind my car.

More fundamentally, the date of Plaintiff's last exposure to traumatic events is immaterial. The inquiry under sections 97-22 and 97-58(c) is not the date of the employee's last exposure to a harmful stimulus, but the date of death, disability, or disablement and the date the employee was informed of the nature of his disease and its work-related cause by competent medical authority. *Dowdy*, 308 N.C. at 706, 304 S.E.2d at 218-19.

¶ 33        Even assuming for the sake of argument that Plaintiff was diagnosed with PTSD in or before 2004, sections 97-22 and 97-58(c) would not operate to bar his claim. The record demonstrates that the PTSD for which Plaintiff now seeks compensation is distinct in cause, more severe in nature, and remote in time from any PTSD he may have suffered in or before 2004. As Plaintiff argues, the medical consensus is that his cumulative exposure to trauma throughout his employment with the CHFD was a significant contributing factor to his current PTSD. By contrast, Plaintiff's medical records indicate that many of the symptoms he was experiencing in the early 2000s were secondary to, and attributable to, his 2002 injury.

¶ 34        Additionally, the symptoms Plaintiff began suffering in 2017 differ from his previous symptoms in their nature and severity. Plaintiff testified that he began experiencing some of the more debilitating symptoms in the spring of 2017 and had "never been at the point I'm at right now." Plaintiff explained that he had been able to work through some of the traumatic situations he had faced in the past and did not recall missing work due to depression or other psychological conditions, prior to October 2017. Plaintiff also indicated that the severity of his sleep issues was new. Plaintiff's wife testified that "she had been married to Plaintiff for thirty-one years, and had not seen him exhibit his current symptoms before 2017."

¶ 35    Lastly, the evidence shows that more than a decade passed between Plaintiff's symptoms in 2002 to 2004 and his current symptoms. On 4 March 2004, Dr. Benjamin noted that Plaintiff was "doing much better" and had "noticed a difference as ha[d] his wife and co-workers." As the Commission found, Plaintiff did not miss any more work due to any alleged work-related condition between his July 2003 return to full duty and October 2017, and there is no "evidence that Plaintiff received any treatment for any neurocognitive or emotional symptoms between March 2004 and October 2017." Daniel Jones, chief of the CHFD from the time Plaintiff was hired until 2015, "was not aware of any time Plaintiff had to miss work due to emotional or psychological symptoms[.]"

¶ 36    The greater weight of the evidence shows that Plaintiff was not clearly, simply, and directly informed of the nature and work-related cause of his present PTSD until 18 December 2017.[2] Because Plaintiff filed his claim on 2 January 2018, the

---

[2] Because Plaintiff was not advised by competent medical authority of the nature and work-related cause of his PTSD until December 2017, the two-year filing period could not begin to run until that time. *See Dowdy*, 308 N.C. at 706, 304 S.E.2d at 218-19 ("The two year period for filing claims for an occupational disease does not begin to run until" the employee is disabled by an occupational disease and is informed by competent medical authority of the nature and work related cause of the disease). Accordingly, we need not determine precisely when Plaintiff became disabled by his condition. *Cf. Rutledge v. Stroh Companies*, 105 N.C. App. 307, 311, 412 S.E.2d 901, 904 (1992) (finding it unnecessary to address the "date on which plaintiff was informed by competent medical authority of the nature and work-related cause of his disease" because plaintiff filed his claim within two years of becoming disabled); *Underwood v. Cone Mills Corp.*, 78 N.C. App. 155, 158, 336 S.E.2d 634, 637 (1985) (same).

Commission erred by concluding that Plaintiff failed to timely file his claim within the two-year period provided by section 97-58(c). Additionally, because Plaintiff gave notice of his diagnosis and prognosis to Sullivan and Turner on 22 December 2017, the Commission erred by concluding that Plaintiff failed to comply with the 30-day notice requirement in section 97-22. We reverse the Commission's opinion denying Plaintiff's claim and remand for a determination of the merits of Plaintiff's claim. *See Rutledge*, 105 N.C. App. at 311, 412 S.E.2d at 904 (reversing the Commission's determination of lack of jurisdiction due to noncompliance with section 97-58(c) and remanding to the Commission for consideration of plaintiff's claim).

## III.     Conclusion

The greater weight of the evidence demonstrates that Plaintiff was not informed of the nature and work-related cause of his current PTSD by competent medical authority until 18 December 2017. Because Plaintiff notified his employer of his condition on 22 December 2017 and filed his claim on 2 January 2018, the Commission erred by concluding that his claim was barred by sections 97-22 and 97-58(c). We reverse the Commission's opinion and award denying Plaintiff's claim and remand for a determination of the merits of Plaintiff's claim.

REVERSED AND REMANDED.

Judges ZACHARY and ARROWOOD concur.